## HOWARD v. UNITED STATES.

(District Court, E. D. Kentucky, at Catlettsburg. October 3, 1924.)

No. 767.

1. **Army and navy** ⟲51½, New, vol. 12A Key-No. Series—**District Court without jurisdiction of action on war risk policy, unless disagreement between beneficiary and Bureau of War Risk Insurance is alleged.**

Under War Risk Insurance Act, § 13, as added by Act Oct. 6, 1917, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514kk), District Court has jurisdiction of action against 'United States by beneficiary of war risk policy only in cases of disagreement between Bureau of War Risk Insurance and beneficiary, and petition should so allege.

2. **Army and navy** ⟲51½, New, vol. 12A Key-No. Series—**Claimant, as beneficiary of war risk policy, not entitled to benefit, except by reason of relationship.**

Claim on war risk policy cannot be sustained, unless under law and evidence beneficiary named by insured is entitled thereto, either as insured's father, or because for one year prior to insured's induction he stood in loco parentis to insured.

3. **Army and navy** ⟲51½, New, vol. 12A Key-No. Series—**Father of illegitimate child cannot be made latter's beneficiary of war risk policy; "parent;" "father."**

The father of an illegitimate child is not within the meaning of the word "parent" or "father" in War Risk Insurance Act, § 22, subds. 4, 4a, as added by Act Oct. 6, 1917, § 2, and amended by Act Dec. 24, 1919, §§ 2–4 (Comp. St. Ann. Supp. 1923, § 514mmm), and section 402, as added by Act Oct. 6, 1917, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514uuu), and cannot be made a beneficiary of war risk policy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Father; Parent.]

4. **Army and navy** ⟲51½, New, vol. 12A Key-No. Series—**When person stands "in loco parentis," within war risk insurance, stated.**

Person stands "in loco parentis" when he acts part of lawful father in providing for child, intending thereby to take father's place in this particular, and he cannot stand in loco parentis to adult who is not mentally or physically incapacitated from providing for himself, and this rule is applicable to War Risk Insurance Act, § 22, subd. 4a, as added by Act Oct. 6, 1917, § 2, and amended by Act Dec. 24, 1919, §§ 2–4 (Comp. St. Ann. Supp. 1923, § 514mmm).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, In Loco Parentis.]

At Law. Action by Calla Howard against the United States. Judgment for the United States.

J. B. Adamson, of Ashland, Ky., for plaintiff.

Sawyer A. Smith, U. S. Atty., of Covington, Ky., for the United States.

COCHRAN, District Judge. This cause is before me for judgment. It is an action on a contract of insurance entered into under the War Risk Insurance Act (Comp. St. §§ 514a et seq.) for $10,000. It is based on section 13 of that act, as added by Act Oct. 6, 1917, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514kk), which authorizes the beneficiary in such a contract to bring an action against the United States thereon, "in the event of disagreement" between the Bureau of War Risk Insurance and himself as to his claim, in the district in which he resides. The plaintiff is the beneficiary named in the contract in suit and resides in Magoffin county in this district. The insured was a bastard. He was born July 4, 1894, was inducted into the service May 27, 1918, contracted for the insurance June 3, 1918, and died of disease whilst in the army, October 5, 1918. When born, his mother's name was Margaret Gibson. He first went by the name of Lacy Gibson, but, at the time of his induction, he went by the name of Lacy Howard. He had so gone for a number of years prior thereto. In his application for the contract, he gave plaintiff's relationship to him as that of father.

In the spring of 1919, plaintiff filed with the bureau a claim to this insurance. The basis of this claim was that he was named as beneficiary in the contract, and that he was the father of the deceased soldier. The mother also asserted a claim thereto, denying that plaintiff was the father of her son. The bureau caused the matter to be investigated by a field examiner, who reported, September 6, 1919, adversely to plaintiff, and, on November 25, 1919, the director found that plaintiff was not the father of the insured, and therefore not entitled to the insurance, and that the mother was.

From that time until the bringing of this action the monthly installments due under the contract were paid to her. Upon the bringing thereof all payments thereunder ceased. After such finding and decision, plaintiff sought to have the case reopened by the bureau, and set up, as an additional ground for the allowance of his claim, that for more than one year prior to the induction of the insured he had stood in loco parentis to him. It was reopened and referred to another field examiner, who reported March 25, 1920, favorably to plaintiff's claim. He said in his report:

"After spending five days in Magoffin county, interviewing disinterested parties and summing up the evidence in general, I find that it is the knowledge of all the best citizens that the said Calla Howard stood in loco parentis for one year prior to Lacy Howard's entry into military service. It is also common knowledge in the immediate vicinity that Calla Howard is the illegitimate father of Lacy Howard."

On April 30, 1920, an associate counsel of the bureau, in writing, reviewed the evidence and advised the bureau that plaintiff had not sustained his claim. He said that "there was not sufficient proof in the record to show who is the father of Lacy Howard." And as to plaintiff's claim that he had stood in loco parentis to the insured for such period of time he said that it must be rejected, because he did not claim "to have stood in this relation to Lacy until 1916, when he was over the age of 21." It does not seem that, since the filing of such report and the giving of such opinion, the director has taken any further action on the claim. There is nothing in the record to indicate that he has, other than the payment of the installments, until the bringing of this action. The allegation of the petition is that plaintiff made application to the bureau for payment of the insurance to him, but that it "refused to entertain such claim, or to make any payment" to him, but had been and was making payments thereof to the mother. The answer denied that the bureau had refused to entertain the claim. The mother was permitted to intervene herein, and in her pleading she admits that plaintiff's application was refused by the ruling of the bureau, and she was held to be entitled to the insurance, and payments had been made to her until the institution of this action when they were stopped.

[1] In brief of plaintiff's counsel it is said that there was "nothing in the record to indicate that the bureau ever passed upon the contents and recommendations" in the second examiner's report, and that "it was perhaps true—very probably true—that it was overlooked in the thousands of claims pending before the bureau at that time." In this state of the record it is extremely doubtful whether this court has jurisdiction of this action. The only basis upon which it can have jurisdiction is that there has been "a disagreement" between the bureau and plaintiff. The petition should have alleged in so many words that there had been, if such was the petitioner's contention, so as to show on its face jurisdiction. It is not entirely certain that what is alleged is the equivalent of this. But, if it is, it is possible to say that the bureau has never taken any final action in the case. I hesitate, because of this, to proceed further. But as, in the consideration of the case, I have reached certain conclusions concerning it, I have thought best to state them and my reasons therefor.

[2] The insured, by naming plaintiff as the beneficiary, indicated that it was his desire that plaintiff should have the insurance contracted for. This desire is calculated to create a bias in favor of sustaining his claim. But it cannot be sustained, unless under the law and the evidence introduced before me he is entitled thereto, on the basis either that he was the insured's father, or for as much as a year prior to the induction had stood in loco parentis to the insured. I do not find it necessary to weigh the evidence and determine whether plaintiff was in fact the father of the insured. The evidence is uncontradicted that from 1916, which was after the insured had come of age, until his induction, he had made his home with plaintiff. He did not stay there all the time. Probably for the most of the time he was away working for others, and whilst so doing he boarded elsewhere and seemingly received his wages. But, off and on, he returned to plaintiff's home, and always looked upon it as his home. Plaintiff's wife did his washing, and at times he did some work for plaintiff. He passed in the neighborhood as plaintiff's son. Plaintiff's family consisted of his wife and nine children. The insured called plaintiff father— possibly the word he used was "Pap"—and plaintiff's children brother and sister. After he went into the army he wrote to the plaintiff, to one of plaintiff's daughters, and to one or two of his sons. He addressed plaintiff as "my dear father," and concluded with the words, "With lots of love, your son, Lacy." The letter to the daughter was addressed, "Dear Sister and All," and con-

cluded with the words, "From your Bro., Lacy H." The letters to the sons were addressed, "Dear Bro.," and concluded with the words, "Your Bro., Lacy Howard."

These letters, from their contents, as well as from what is quoted therefrom, indicate real affection for plaintiff and his children, though, in weighing them, it is to be taken into consideration that he did not write them himself, but had another write them for him. He could not write. He had never gone to school. It is possible, therefore, that the words of endearment which they contain represent, to a certain extent, the personality of the amanuensis. Such, then, in addition to plaintiff's testimony that he had intercourse with the insured's mother, and she had told him that he was his father, the testimony of a witness that insured's mother had told her that plaintiff was the father of the insured, the testimony of several witnesses that the insured resembled plaintiff and his children, and the fact that he went by the name of Lacy Howard, made up substantially plaintiff's case under the evidence introduced before me. It makes a strong case for plaintiff. It is difficult to account for the insured's action, except on the ground that his mother had told him that plaintiff was his father, and for plaintiff's action, except on the basis that he had had intercourse with the insured's mother, and she had told him that he was the father of the insured.

On the other hand, a strong case was made against plaintiff being the father of the insured. His mother had had two illegitimate children before his birth. Plaintiff did not claim to be the father of either of them. She testified that the father of the first was named Blankenship, and of the other Allen Farler, who she also testified was the father of the insured, and who afterwards married her sister. Farler testified that he had had intercourse with her, and understood that he was the father of both of the two last children. After their birth the mother married Noah Collins, a negro by whom she had six children. It would seem that she had negro blood in her. Her mother was a white woman, but her father was looked upon as having negro blood in him, though it is possible that the color in him was due to Indian and not negro blood. The evidence as to this was very vague and unsatisfactory. There was no indication of negro blood in the insured. He was tall and good looking. He made his home with his mother and her husband until he was

13 years old. Before going to live with plaintiff, he lived with two second cousins of plaintiff, first with Grover Howard, for about a year, and then with Charles Howard, his brother, for the rest of the time. These Howards did not live in the same neighborhood as plaintiff. They lived about six miles from him. It was during the time that he lived with Charles Howard that he first took the name of Lacy Howard.

According to plaintiff's testimony he never saw the insured until he was 7 or 8 years of age, and never manifested any interest in him before he made his home with him other than, when he was about 12 or 14 years of age, to buy a pie for him at a pie supper. He was never at plaintiff's home before then, except possibly one night when he was about 17 or 18 years of age. There was no evidence that, before the insured made his home with plaintiff, he claimed to be the son of plaintiff, or that he passed as plaintiff's son. My construction of plaintiff's evidence, as to his being known as plaintiff's son, relates to the time after he made his home with plaintiff. At that time, if not before, he had become ashamed of his mother, not so much, perhaps, on account of the looseness of her character, as because of her having married a negro. He resented the name of Gibson being applied to him, or any reference to his connection with her. It was his aim and his desire to turn his back on his past. Possibly there was something in this to account for his conduct after he made his home with plaintiff.

In addition to the foregoing, as a part of the case against plaintiff, is to be considered the testimony of Benjamin Salyers and his wife, neighbors of plaintiff and on friendly terms with him, whose reputation was not attacked, and who were apparently truthful, that they were with plaintiff at the post office when he received the contract of insurance, which had been mailed to him, and that he then said to Salyers: "I am a rich man. Lacy has made me a policy of $10,000. Just as well made it to you, for he ain't no more mine than he is yours." That he had made this statement was not squarely denied by plaintiff. The most he would say, when he was asked about it on cross-examination, and he was asked several times, was that he had no recollection of making it. In rebuttal, however, he did testify that he did not make such statement, but it was only as the result of prodding and after first testifying, "Not to

my recollection," when asked as to whether he had made it.

[3] In view of the evidence bearing on the question, it is difficult to determine what is the truth as to the matter. The credibility of most of the important witnesses is affected by interest. It has been assumed that the burden was on plaintiff to establish that he was the father of the insured, but, in view of the statement of the insured, in his application, and his making him beneficiary, this is not entirely certain. I do not, however, feel called upon to determine the question as to where the burden as to this matter lays, or as to the truth about the plaintiff being the father of the insured, because, in my opinion, plaintiff, under the law, could not be made a beneficiary of the contract of insurance, even though he may have been the insured's father. An illegitimate father could not be so made.

By section 402 of the War Risk Insurance Act, as added by Act Oct. 6, 1917, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514uuu), it is provided:

"The insurance shall be payable only to a spouse, child, grandchild, parent, brother, or sister."

And by section 22, as added by Act Oct. 6, 1917, § 2, and amended by Act Dec. 24, 1919, §§ 2–4 (Comp. St. Ann. Supp. 1923, § 514mmm), it is provided:

"(4) The term 'parent' includes a father, mother, grandfather, grandmother, father through adoption, mother through adoption, stepfather, and stepmother, either of the person in the service or of the spouse.

"(4a) The terms 'father' and 'mother' include stepfathers and stepmothers, fathers and mothers through adoption, and persons who have stood in loco parentis to a member of the military or naval forces at any time prior to his enlistment or induction for a period of not less than one year."

The word "parent" is broad enough to cover an illegitimate parent, and the word "father" is broad enough to cover an illegitimate father. The question is whether those words, as used here, have this broad meaning, or only the narrower one of legitimate parent and legitimate father. In statutory construction it seems to be the rule to give those words the narrower meaning, unless there is something in the statute to indicate otherwise.

The case of Dickinson v. Railway Co., 2 Hurl. & C. 735, was an action brought on what was known as "Lord Campbell's Act."

It provided "that every such action shall be for the benefit of the wife, husband, parent and children of the person whose death shall have been caused." It was held that an illegitimate child could not maintain such an action. Pollock, C. P., said:

"But, beyond all doubt, in the construction of the act of parliament, the word 'child' means legitimate child only."

The case of Marshall v. Wabash Railroad Co., 120 Mo. 275, 25 S. W. 179, was an action brought to recover damages for the death of another under the wrongful death statute of that state. The provision was that, if deceased was a minor, the "father and mother" might join in a suit to recover, each to have an equal interest in the judgment, and that, "if either of them be dead, then by the survivor." It was held that the father of an illegitimate child did not come within the meaning of the act, and could not maintain the action.

The case of Harkins v. Railroad Co., 15 Phila. 286, involved the wrongful death statute of Pennsylvania. It enacted that the persons entitled to recover should be "the husband, widow, children or parents of the deceased and no other relatives." It was held that the statute did not give any one the right to recover for the death of an illegitimate child. The court said that "the words 'husband, widow, children, or parents of the deceased, and no other relative,' had in view the family relation as constituted and recognized by law, and that it was not intended to extend the benefits of the act to persons not falling within the legal definition of the enumerated relationships."

The case of Appeal of Gibson, 154 Mass. 378, 28 N. E. 296, involved the Massachusetts statute regulating the adoption of children. It required notice of the proceeding to be given to the parents. It was held that it was not necessary to give notice to the father of a bastard. It was said:

"We think that the word 'parent' as there used has its legal signification, and is intended to designate only the lawful father or the mother. There is no reason why the Legislature should confer upon the father the right to notice in such cases. He has no right to the custody of the child, * * * or control of its estate. He is at most a putative father in reputation only, but not in law."

The case of McDonald v. Pittsburgh, etc., Ry. Co., 144 Ind. 459, 43 N. E. 447, 32 L. R. A. 309, 55 Am. St. Rep. 185, involved the

wrongful death statute of Indiana, which provided that a father might maintain an action for the death of a child. It was held that the father of a bastard, whom his mother had abandoned and he had taken custody of, had no right of action for his death under this statute.

Apart from this general rule in the construction of statutes, there are indications in the War Risk Insurance Act that it was not intended that the father of a bastard should be a beneficiary of a contract of insurance procured by him. The first of the possible beneficiaries provided for in section 402 is "a spouse." There is no such thing as an illegitimate spouse. Other possible beneficiaries provided for, either in the main clause in section 402, or in the subordinate clause in section 22, defining the word "parents" in the former, can have reference only to those having a legitimate connection with the insured.

In the definition in section 22 of the word "child," in the main clause it is made to include "an illegitimate child" under certain conditions. This shows that illegitimate relations to the insured were had in mind, but in the definition of a father it was not provided that it should include an illegitimate father. My conclusion, therefore, is that plaintiff is not entitled to judgment on the ground that he is the illegitimate father of the insured, even if that be the case.

[4] Is he entitled thereto, then, on the ground that, for as much as one year prior to the induction of the insured into the service, he stood in loco parentis to the insured? He did not, unless it is possible for one to stand in loco parentis to an adult. It is not claimed that plaintiff so stood before the insured came to make his home with him, which was in 1916, when he was 22 years of age. Is it possible for one to stand in loco-parentis to an adult? The phrase, "stand in loco parentis," is a legal one. It represents a definite legal conception, and it must be taken that, as used in the War Insurance Act, it is used in this sense and none other. There is no indication of looseness anywhere in the act in its specification of possible beneficiaries of a contract of insurance authorized by it. As stated, an illegitimate child may be beneficiary, but he must have been "acknowledged in writing signed by" the father, or the latter must have been "judicially ordered or decreed to contribute" to his support, or must have been "judicially decreed to be the putative father." An adopted child may, but he must have been "legally adopted;" and a stepchild may, but he must have been a "member of the man's household."

There is therefore no room for looseness in determining who is meant by the phrase "have stood in loco parentis." Sir Wm. Grant, M. R., in Wetherby v. Dixon, 19 Ves. 407–412, said that a person standing in loco parentis is one "assuming the parental character or discharging parental duties." In Ex parte Pye, 18 Ves. 140–154, Lord Eldon said that he was one "meaning to put himself in loco parentis—in the situation of the person described as the lawful father of the child." Lord Cottenham in the case of Powys v. Mansfield, 3 M. & C. 359, 368, said: "No doubt the authorities leave in some obscurity the question as to what is to be considered as meant by the expression, universally adopted, of one in loco parentis." He said that Lord Eldon's definition was one which "I readily adopt, not only because it proceeds from his high authority, but because it seems to me to embrace all that is necessary to work out and carry into effect the object and meaning of the rule." He said further concerning it that "it must be considered as applicable to those parental offices and duties to which the subject in question has reference, namely, to the office and duty of the parent to make provision for the child. The office and duties of a parent are infinitely various, some having no connection whatever with making provision for a child; and it would be most illogical, from the mere exercise of any of such offices or duties by one not the father, to infer an intention in such person to assume also the duty of providing for the child. The relative situation of the friend and of the father may make this unnecessary and the other benefits most essential."

As to Sir Wm. Grant's definition, he said that it "may not seem to differ much from Lord Eldon's but it wants that which, to my mind, constitutes the principal value of Lord Eldon's definition, namely, the referring to the intention rather than the act of the party." The Vice Chancellor whose ruling was reversed had said that he "must be a person who has so acted towards the child as that he has thereby imposed upon himself a moral obligation to provide for it, and that the designation will not hold where the child has a father with whom it resides and by whom it is maintained."

Concerning this Lord Cottenham said: "This seems to infer that the locus parentis assumed by the stranger must have refer-

ence to the pecuniary wants of the child, and that Lord Eldon's definition is to be so understood, and so far I agree with it; but I think the other circumstances required are not necessary to work out the principle of the rule, or to effectuate its object."

He concluded with this statement:

"The rule, both as applied to a father and to one in loco parentis, is founded upon the presumed intention. A father is supposed to intend to do what he is in duty bound to do, namely, to provide for his child according to his means. So one who has assumed that part of the office of a father is supposed to intend to do what he has assumed to himself the office of doing. If the assumption of the character be established, the same inference and presumption must follow. They having so acted towards a child as to raise a moral obligation to provide for it affords a stronger inference in favor of the fact of the assumption of the character; and the child having a father with whom it resides, and by whom it is maintained, affords some inference against it, but neither are conclusive."

In that case a rich bachelor had a brother, who had six daughters, and who was in rather straitened circumstances. The daughters lived with their parents. He provided for his nieces through their father; i. e., he supplied the latter with means to provide for them, and with which he did provide for them. He made a will in which he bequeathed to each of the five, other than the eldest, £10,000, he having theretofore settled that amount on her. Shortly afterwards the third daughter married, and he settled upon her that amount. The question was whether this settlement was an ademption of the legacy. It was held that it was, on the ground that the testator had stood in loco parentis as to his nieces, and there was, therefore, a presumption against double portions, which presumption was not repelled, but supported by the evidence. I gather from this decision that the essential thing to bring about the relation of standing in loco parentis to a child is that one should intend to put himself in that position by performing the parental duty of providing for the child. It is not brought about by the performance of any other duty of the parent to his child short of this. It is not essential that the child be a member of his family, or that he provide for the child directly. The child may live with its parents, and the provision may be made indirectly; i. e., through the parents.

Nor is it essential that he should exercise any of the rights of the parent, such as custody, control, services, or earnings. It is not even essential that he be entitled to exercise any of such rights. The matter is thus put in the headnote of that case:

"The proper definition of a person in loco parentis to a child is a person who means to put himself in the situation of the lawful father of the child, with reference to the father's office and duty of making a provision for the child."

This definition is adopted in 31 C. J. p. 358, note 77 (a), where in reference to the phrase "in loco parentis" it is said:

"When used to designate a person it means (1) one who means to put himself in the situation of a lawful father to the child, with reference to the office and duty of making provision for the child; * * * (2) one assuming the parental character and discharging the parental duties."

Decisions are cited in support of each definition here given. One may therefore be said to stand in loco parentis to a child when he acts the part of a lawful father in performing the duty of providing for him, intending thereby to take his place in this particular. To bring about such relationship or status it is not essential that he act the part of the parent in any other particular. It is essential only that he act such part in this particular. That he act this part, and no more, is required. In so acting, so intending, he performs a parental duty and assumes the parental character. This requirement is definite and certain, and is capable of ready application in any given case. In it there is no looseness or sentimentalism.

Such being the case, it would seem to follow that one cannot stand in loco parentis to another to whom his lawful father, if he has one, does not owe the duty of making provision for him. Where there is no duty of making provision, there can be no performance of such duty. There may be provision, but it is not in performance of a duty to make it. Hence one cannot stand in loco parentis to an adult. A parent does not owe the duty of making provision for his adult child. In 20 R. C. L. p. 586, it is said:

"The general rules of the law of parent and child being based on the child's incapacity, both natural and legal, and its consequent need of protection and care, apply only while the child is under the age of majority. This is a fundamental principle, that lies at the very foundation of society,

and was intended to support and maintain the exercise of parental authority in the family and the home, and to guard and protect the children of the family until their minds should become sufficiently cultivated and their judgment sufficiently matured to enable them to act for themselves. The precise limit of time is fixed by law, and it cannot, in any case, be either enlarged or diminished by evidence, however cogent, or by argument, however persuasive."

An exception to this is then noted in these words:

"But where a child is of weak body or mind, unable to care for himself after coming of age, and remains unmarried and living in the father's home, it has been held that the parental rights and duties remain practically unchanged. The father's duty to support the child continues as before. He is still entitled to receive the child's services and wages, and the child follows any change of settlement of the father, like a minor child."

Another qualification may be brought about by a statute for the relief of paupers and indigent persons. Concerning such statutes, this is said in 20 R. C. L. 1, 587:

"Naturally the first obligation under such statutes rests on the children of a needy parent, and on the parents of a needy son or daughter. This duty differs radically from the duty of support of a minor child by its parents."

The whole matter is thus put in 29 Cyc. p. 1612:

"In the absence of statute, a parent is under no legal obligation to support an adult child, but the legal liability for the support of the child ceases when it reaches the age of majority, unless the child is in such a feeble and dependent condition, physically or mentally, as to be unable to support itself."

It would seem that this obligation ceases, as well to a female child as to a male child, notwithstanding she may be said to belong to the weaker sex. This may be inferred from the rule in seduction cases, where the daughter is over 21. In Webb's Pollock on Torts, p. 278, in a note, it is said:

"Where the daughter was more than 21 years of age, the American courts agree with the English courts in holding that there must exist some kind of service; but the slightest acts have been held to constitute the relation of master and servant in such a case."

The reasoning I have indulged in then comes to this: One person cannot stand in loco parentis to another person who is an adult male and not incapacitated, either mentally or physically, from providing for himself. I am strengthened in this conclusion by the fact that, so far as my research goes, I have been unable to find a case arising prior to the enactment of the provision in the War Risk Insurance Act, here involved, where it was held that one person stood in such relation to such another person. It has, however, been so held recently in the case of Meisner v. United States (D. C.) 295 F. 866, which, like this, arose under the War Risk Insurance Act. That act provides in section 22 that the words "brother" and "sister," designated as possible beneficiaries in section 402, include the children of a person who, for a period of not less than one year prior to the enlistment or induction of the soldier, stood in loco parentis to him. There the beneficiary was the daughter of a person whom she claimed had so stood in relation to the soldier. He had no relations known to himself, and was a wanderer, sick, friendless, and penniless. In this condition he was taken into the home of her parents, who lived on a farm, and given shelter, food, and medical attention. He was over 24 years of age at this time. He recovered from his illness and continued to so make his home as a member of the family until he enlisted over two years afterwards. He was looked upon as a member of the family, and he so looked upon himself. He ate at the same table with the other members thereof and worked about the farm. There was no agreement for wages or other compensation for his services, but he was given what he needed in the way of clothing, necessaries and spending money. He treated and spoke of her father and mother as his father and mother, and they treated and spoke of him as their son. He treated and spoke of the claimant as sister, and she treated and spoke of him as brother. Such was the testimony on behalf of the claimant. In the application for the contract of insurance, however, he described her as his cousin.

The ground of the decision may be taken to be that it was thought that a parent owes duties of a substantial character to his adult child, even though he may not be incapacitated, either mentally or physically, and that without reference to any statute imposing them upon him, which duties the father of the soldier would have owed to

him had he been living, and the beneficiary's father had performed for more than a year prior to the enlistment, thereby putting himself in the place of such father It was made in the light of the definitions of the phrase "in loco parentis" given in Cyc. and Black's Law Dictionary, which were quoted, both of which recognize that in order to bring about such relation it is essential that there be an assumption of the duties of a parent. And it was said:

"No sound reason appears why a person may not assume a parental relation toward an adult as well as toward a minor. The responsibilities and obligations may be fewer, but substantial ones remain."

Just what substantial responsibilities and obligations on the part of a parent toward an adult child were had in mind does not appear. It does not appear that it was had in mind that there is a duty on the part of a parent to provide for his adult child, the assumption of which we have found to be the essential thing to bring about the relation in question. And the definitions quoted from Cyc. and Black are deficient in that they do not recognize that the thing which is essential to bring about such a relation is the assumption of such duty. The definitions are too general and include things which are not essential. According to Cyc. a person standing in loco parentis is "one who has put himself in the situation of a lawful parent by assuming the obligations incident to the personal relation without going through the formalities necessary to a legal adoption," and such assumption "is a question of intention." According to Black, he is one who is "charged, fictitiously, with a parent's rights, duties, and responsibilities." Neither one of these authorities has anything to do with the question as to whether a parent is under obligation to his adult child, and, if so, to what extent. I do not understand that the thought that the soldier was the subject of substantial parental responsibilities and obligations was based on the idea that the soldier was incapacitated mentally or physically to provide for himself. When taken in, he was a vagabond, sick, friendless, and penniless. But it was not long before he was put on his feet.

Two considerations were appealed to as enforcing the right of the claimant to the insurance. One was that claimant's father, under the Missouri statute, in which state the case arose, could have adopted the soldier. It seems to have been thought that there was some connection between the sta-

2 F.(2d)—12

tus of standing in loco parentis and that of an adoptive father; i. e., that where there can be an adoption there can be a standing in loco parentis, the only difference being that, in the one case, there must be legal formalities to bring about the status, whereas, in the other case, no such formalities are necessary. Some encouragement to this view seems to be given by the definition of the phrase "in loco parentis" in Cyc. above quoted. It was said:

"If an adult is a legal subject of adoption, which formally establishes the relationship of parent and child, and if one who assumes the obligations incidental to the parental relation, and takes the place of a parent, without going through the formalities necessary to a legal adoption, stands in loco parentis to another, why should age condition the nature of the relationship?"

It does not seem to me that there is any connection whatever between the two relationships. There is no reason, so far as I can see, why it should be held that, in every case where the adoptive relation can be brought about, the in loco parentis relation can be also. The one status is a creature of statute. It could not be brought about at common law. The other exists only under the common law. Formality in a sense is equally essential to bring about the relationship in each instance. In the one case it is that which is required by the statute. In the other it is that the party who is to acquire the parental position shall assume the parental duty of making provision for the child. Each has a different purpose in view. The one is to make the adoptive child the heir at law of the adoptive father. No such result follows from the relationship of in loco parentis. Nor is it the universal rule that adults may be adopted. In some states, as in this state, it is clear that it is the intent of the statute that adults may be adopted. And in some states, as in Missouri, the word "child" in the adoption statute is construed to include adults as well as infants. But in other jurisdictions it is otherwise. In 31 R. C. L. p. 596, it is said:

"The person to be adopted is frequently designated in the statute authorizing the proceeding as a minor child, and in such case, of course, no question of the adoption of an adult can arise. But in the absence of such a statutory provision, the circumstance that the statute used the word 'child' is not necessarily conclusive in favor of the position that only a minor can be adopted under it. Since that word has two general-

ly understood meanings, one signifying minority, and the other relationship, and by some courts it has been held that, in a statute relating to adoption, the word has reference to a relational status, and that consequently, under such a statute, and in the absence of any provision to the contrary, an adult may be adopted. And the adoption of adults has been expressly recognized as valid in at least one jurisdiction by statutory provision. But by other courts the circumstance that the statute authorizing the proceeding used the word 'child' has been held to confine the right of adoption to minors."

In this state the statute, though it authorizes the adoption of adults, conceives that the parental relation is brought about by the adoption proceeding only in case of minors. The Kentucky statute is in these words:

"Sec. 2071. Any person twenty-one years of age, may, by petition filed in the circuit court of the county of his residence, state, in substance, that he is desirous of adopting a person, and making him capable of inheriting as heir at law of such petitioner; and said court shall have authority to make an order declaring such person heir at law of such petitioner, and as such, capable of inheriting as though such person were the child of such petitioner; but no such order shall be made if the petitioner be a married man or woman unless the husband or wife join in the petition.

"Sec. 2072. Said court shall have authority, by consent of the parents, or either of them, if one be dead, to give the petitioner the parental control of such adopted person, if an infant; and said petitioner shall be under the same responsibilities as if the person so adopted were his own child."

The other consideration referred to is that there is indication in the War Risk Insurance Act itself that it was contemplated that one might stand in loco parentis to an adult. It is said:

"The word 'children' when used irrespective of parentage, may denote that class of persons under the age of 21 years of age as distinguished from adults; but its ordinary meaning with respect to parentage is sons and daughters of whatever age. It is frequently so used with reference to those who stand in the place of parents and have assumed the parental relation. Congress evidently had this relationship in mind when it provided that the provisions, 4a and 5a should apply to persons 'who have stood in loco parentis to a member of the military forces *at any time prior* to his enlistment or induction for a period of not less than one year.' The provision contains no limitation as to age. It was open to any member of the military or naval forces."

I can see no such indication therein. If there is any indication at all, it would seem to be the other way; i. e., that it is only as to a minor that one can stand in loco parentis. It is true that the statute does not in so many words refer to age. But if one can stand in loco parentis only to a minor, the statute can only have a minor in contemplation. It was not necessary that there should be any reference to age. It will be noted that the statute looks to the past, and not to the present. It is those who have stood in such place, and not those who then stand therein, to which its verbiage relates. The bulk of the soldiers were adults. None but adults were covered by the Selective Draft Act.[1] Though minors over 16 could enlist, it could only be with the consent of parents or guardians. If it is conceivable that an adult male, to whom another stood in loco parentis, assuming that to be possible, would be a desirable or acceptable soldier, and hence that he was within the purview of the statute, why did it look to such relation as existing in the past, and not at the time of enlistment or induction? Where such standing existed at the time of enlistment or induction, there would seem not to be as much reason for requiring that it should have existed for as much as a year as where it had existed some time in the past. If it then existed, though it had not existed for that length of time, it might be permanent in character and calling for as much, if not more, consideration than if it had existed so long. If, however, it was a relation that had existed in the past, when the soldier was a minor, there was greater reason for requiring that it should have existed for as much as a year.

I feel constrained, therefore, to hold that it is not possible for a person to stand in loco parentis to an adult who is not mentally or physically incapacitated, and that therefore the plaintiff did not stand in such relation to the insured soldier.

It follows that the action must be dismissed.

[1] Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a-2044k.