DAVID LINER, AS ADMINISTRATOR OF THE ESTATE OF AMBRA D. RICHARDSON AND VERONICA RICHARDSON v. RONALD AND LINETTA BROWN

No. 9321SC1118

(Filed 15 November 1994)

**1. Parent and Child § 2 (NCI4th)— wrongful death—decedent's aunt—not in loco parentis**

The trial court erred in a wrongful death action by granting summary judgment for defendants based on parental immunity because they claimed to be *in loco parentis* to decedent where the decedent, Ambra, was the child of Veronica Richardson and Dennis Richardson, who are divorced; Ambra was adjudicated to be a dependent and neglected juvenile and placed in the legal and physical custody of the Forsyth County Department of Social Services; Ambra was placed with her paternal aunt, Linetta

**LINER v. BROWN**

[117 N.C. App. 44 (1994)]

Brown; and she drowned in the Browns' swimming pool. Whether defendants stood *in loco parentis* is a question of intent to assume parental status and depends on all the facts and circumstances of the case. Here, DSS had both legal and physical custody, with a ninety day review having been ordered, having as an essential goal reuniting the parent and child; defendants were aware that they were obliged at all times to surrender Ambra's placement with them should the court reinstate custody with the mother or should DSS choose a different placement; and Ms. Richardson continued to love and care for Ambra's well-being as evidenced by her actions. The mere fact that defendants were obligated to provide and did provide a stable environment for Ambra for a two month period does not transform the relationship into one of parent-child.

**Am Jur 2d, Parent and Child §§ 75 et seq.**

**Liability of parent or person *in loco parentis* for personal tort against minor child. 19 ALR2d 423.**

2. **Parent and Child § 13 (NCI4th)— wrongful death—parent-child immunity—paternal aunt—temporary custody and control**

Summary judgment should not have been granted for defendants in a wrongful death action where defendants claimed parental immunity, even if they stood *in loco parentis* to the victim, because extension of the parent-child immunity doctrine to one having temporary custody and control of a child would not further the policies underlying the doctrine.

**Am Jur 2d, Parent and Child §§ 138 et seq.**

**Family relationship other than that of parent and child or husband and wife between tortfeasor and person injured or killed as affecting right to maintain action. 81 ALR2d 1155.**

Judge JOHN concurring in part and concurring in part only in the result.

Appeal by plaintiff and defendants from judgment entered 21 July 1993 in Forsyth County Superior Court by Judge Melzer Morgan. Heard in the Court of Appeals 23 August 1994.

*Crawford Whitaker & Hough, P.A., by William A. Hough, III and David R. Crawford, for plaintiff-appellant/appellee David Liner, as Administrator of the Estate of Ambra D. Richardson.*

*Nichols, Caffrey, Hill, Evans & Murrelle, by William L. Stocks and Richard J. Votta, for defendant-appellants/appellees.*

GREENE, Judge.

David Liner (Liner), as administrator for the estate of Ambra D. Richardson (Ambra), appeals from a judgment entered in Forsyth County Superior Court on 21 July 1993, granting Ronald and Linetta Brown's (defendants) motion for summary judgment based on parental immunity in Liner's claim for wrongful death. Defendants appeal from that part of the judgment denying their motion for summary judgment as to the claim of Veronica Richardson (Ms. Richardson) for negligent infliction of emotional distress.

Ms. Richardson and Dennis Richardson (Mr. Richardson) are the divorced parents of Ambra, born 7 June 1987. Mr. Richardson is the brother of defendant Linetta Brown. By order dated 27 April 1990, Judge Loretta C. Biggs (Judge Biggs) adjudicated Ambra to be a dependent and neglected juvenile, placed her in the legal and physical custody of the Forsyth County Department of Social Services (DSS), and gave DSS "placement responsibility for said minor" with the "cause [to] be reviewed within ninety days of the April 25, 1990, hearing." In addition, Judge Biggs ordered Ms. Richardson, beginning on 27 April 1990 and "continuing until further order of the Court," to "pay to the Clerk of Superior Court of Forsyth County . . . the sum of $30.00 per week for the support and maintenance of Ambra Dean Richardson. Said Clerk shall remit said payments to the minor's caretaker at the following address: Mrs. Linetta Brown . . . ." Judge Biggs ordered Mr. Richardson to "continue to make without fail his $30.00 per week child support payment for the support and maintenance of" Ambra. Judge Biggs also found that Ambra "has been placed by the DSS with her paternal aunt, Linetta Brown, since the DSS assumed custody of the minor . . . [and] [i]t is the DSS's intent to maintain temporary placement of the minor with Mrs. Brown."

In March of 1990, DSS temporarily placed Ambra in the home of defendants, who were not licensed foster parents, and this arrangement continued after Judge Biggs' 27 April 1990 order. Ambra had spent weekends with defendants for about eighteen months prior to

March of 1990. On 21 June 1990, Ambra drowned in defendants' swimming pool.

On 19 June 1992, Liner and Ms. Richardson (plaintiffs) filed a complaint in Forsyth County Superior Court, Liner alleging wrongful death and Ms. Richardson alleging negligent infliction of emotional distress. On 17 August 1992, defendants filed an answer and defenses, stating that "[o]n the occasion referred to in the complaint the defendants stood in loco parentis to Ambra D. Richardson who had been placed with defendants and lived with the defendants, with the defendants functioning as [her] parents" so that "the doctrine of parental immunity is applicable to any claims against the defendants for bodily injury to or the wrongful death of Ambra . . . and also is applicable to the derivative claim of Veronica Richardson for alleged emotional distress resulting from [Ambra's] death."

In her affidavit, Ms. Richardson stated:

7. Throughout the time from April 25, 1990 through June 21, 1990, I:

  a. regularly visited with Ambra or attempted to regularly visit with Ambra;

  b. tried to see that Ambra received proper psychological care; and,

  c. stayed in constant touch with [DSS] regarding Ambra's welfare; and,

8. It was my intention after consenting to relinquish the custody of Ambra on April 25, 1990 to do everything in my power to continue to provide love, affection and support to Ambra, to comply fully with the terms of all Court Orders pertaining to me, and to seek reinstitution of my custody over Ambra upon review of the case by the Court.

Ms. Richardson stated in her deposition that she visited Ambra "several times a week" at defendants' house or at day care, and she "raised some [C]ain [with DSS] about Ambra having two black eyes, a swollen nose, and her left cheek swollen and blue after [defendants] had her. And [she] went down to the daycare . . . and [she] took pictures of" Ambra. From March until 21 June 1990, Ms. Richardson paid child support "through the child support office over at the courthouse" and had paid for Ambra's support "through June 22nd." Ms. Richardson stated her "psychological evaluation had come in the day

before [Ambra] died that did state [she] was a proper and fit mother to raise [her] child." She was "pending the starting of parenting classes which [DSS] wanted [her] to do."

Mr. Brown stated in his affidavit that after Ambra was adjudicated a neglected and dependent juvenile, he and Mrs. Brown "naturally wished to continue [their] growing relationship with Ambra and to have her live on a continuous basis as a part of [their] family." "In every respect during this period of time, we were the persons who served and functioned as Ambra's parents."

On 14 October 1992, plaintiffs filed a motion for summary judgment and submitted defendants' affidavits and Ms. Richardson's affidavit and deposition in support. On 2 April 1993, defendants filed a motion for summary judgment. By judgment signed 21 July 1993, the trial judge found and concluded that "[t]he defendants' motion for summary judgment as to the claim of Veronica Richardson for negligent infliction of severe emotional distress should be and the same hereby is denied." The trial judge granted defendants' motion for summary judgment as to the wrongful death claim because defendants were "in loco parentis to the decedent and, therefore, [are] entitled to parental immunity which bars [Liner's] claim."

We first dismiss defendants' appeal as to Ms. Richardson's claim for negligent infliction of emotional distress because a denial of a motion for summary judgment is not appealable. *Waters v. Personnel, Inc.*, 294 N.C. 200, 208, 240 S.E.2d 338, 344 (1978).

---

The issues presented are (I) whether defendants stood *in loco parentis* to Ambra; and (II) if so, whether they are entitled to parental immunity as to the wrongful death claim.

I

[1] This Court has defined the term *in loco parentis* to mean "in the place of a parent" and has defined "person *in loco parentis*" as "one who has assumed the status and obligations of a parent without a formal adoption." *Shook v. Peavy*, 23 N.C. App. 230, 232, 208 S.E.2d 433, 435 (1974); *see also Howard v. United States*, 2 F.2d 170, 174 (1924) (person *in loco parentis* is one "assuming the parental character or discharging parental duties"); Black's Law Dictionary 787 (6th ed. 1990) (person *in loco parentis* is one "charged, factitiously, with a parent's rights, duties, and responsibilities"); N.C.G.S. § 7A-517(16.1) (1993) (*in loco parentis* defined in juvenile code as one, other than parents or legal guardian, who has assumed status and obligation of

a parent without being awarded legal custody by a court). A person does not stand *in loco parentis* "from the mere placing of a child in the temporary care of other persons by a parent or guardian of such child. This relationship is established only when the person with whom the child is placed intends to assume the status of a parent—by taking on the obligations incidental to the parental relationship, particularly that of support and maintenance." *State v. Pittard*, 45 N.C. App. 701, 703, 263 S.E.2d 809, 811, *disc. rev. denied*, 300 N.C. 378, 267 S.E.2d 682 (1980); *see* 67A C.J.S., *Parent and Child* §§ 153-158, at 548-55 (1978); 59 Am. Jur. 2d, *Parent and Child* § 75, at 217-18 (1987); 3 Robert E. Lee, *North Carolina Family Law* § 238, at 98-100 (1963). Therefore, whether defendants stood *in loco parentis* to Ambra at the time of her death is a question of intent "to assume parental status" and depends on all the facts and circumstances of this case. *See Hush v. Devilbiss Co.*, 259 N.W.2d 170, 174 (Mich. App. 1977) (intent to assume parental status can be inferred from parties' acts and declarations).

The facts and circumstances of this case do not support a determination that defendants stood *in loco parentis* to Ambra. Although Mrs. Brown was Ambra's aunt, DSS had both legal and physical custody of Ambra pursuant to Judge Biggs' 27 April 1990 order. Judge Biggs ordered the matter to be reviewed in ninety days, when one of the essential aims of such a review hearing—"to reunite the parent(s) and the child, after the child has been taken from the custody of the parent(s)"—would be considered. *In re Shue*, 311 N.C. 586, 596, 319 S.E.2d 567, 573 (1984). Defendants were therefore aware they were obliged, at all times, to surrender Ambra's placement with them should the court reinstate custody with Ms. Richardson or should DSS choose a different placement for Ambra. Furthermore, during the two months Ambra lived with defendants, Ms. Richardson regularly visited Ambra and made payments "for the support and maintenance of Ambra" to the clerk of court who in turn was to deliver such payments to Mrs. Brown pursuant to Judge Biggs' 27 April 1990 order. Ms. Richardson continued to love and care for Ambra's well-being as evidenced by her photographing the bruises she noticed on Ambra's body after being placed in defendants' care and contacting DSS about the bruises. Ms. Richardson also obtained a psychological evaluation showing she was a fit parent, tried to insure "that Ambra received proper psychological care," and was about to begin parenting classes requested by DSS. The mere fact defendants were obligated to provide and did in fact provide a stable environment for Ambra for a two

month period does not transform the relationship of defendants with Ambra into one of parent-child. Defendants, like foster parents, have a "unique responsibility clearly differ[ing] from the supervisory functions of a natural parent." *Andrews v. County of Otsego*, 446 N.Y.S.2d 169, 173 (1982). Defendants, like foster parents, "must strive to provide a stable environment and at the same time, encourage, rather than discourage, the relationship of the foster child and natural parent and ease the return of the child to the natural parent." *Id; see also* N.C.G.S. §§ 7A-517(5) & (16.1) (in juvenile code, our legislature, while specifically including foster parents within definition of caretaker, did not include foster parents within definition of *in loco parentis*). For these reasons and from all the facts and circumstances of this case, defendants did not intend to assume the status of Ambra's parents and did not stand *in loco parentis* to Ambra; therefore, summary judgment in favor of defendants should be reversed. *See Mayberry v. Pryor*, 374 N.W.2d 683 (Mich. 1985) (in accord with *Andrews*).

II

**[2]** Even if we determined defendants stood *in loco parentis* to Ambra, they are not entitled to claim immunity based on the parent-child immunity doctrine. North Carolina recognizes the parent-child immunity doctrine that an unemancipated minor child cannot maintain an action based on ordinary negligence against his or her natural parent; however, the doctrine does not apply where it "has been specifically abolished or amended by the legislature." *Doe v. Holt*, 332 N.C. 90, 93, 418 S.E.2d 511, 513 (1992) (our Supreme Court recognized that parent-child immunity doctrine does not bar tort claims for injuries unemancipated minors have suffered as a result of a parent's willful and malicious conduct); *see* N.C.G.S. § 1-539.21 (1993) (abolishes parent-child immunity doctrine where injury to child arises out of operation of motor vehicle owned or operated by child's parent). Defendants argue that the parent-child immunity doctrine extends to those standing *in loco parentis*; therefore, "as a result of their parental relationship with [Ambra], the wrongful death claims asserted by the plaintiff in behalf of her estate are barred as a matter of law by the doctrine of parental immunity." We disagree.

The parent-child immunity doctrine is intended to serve several public policies, foremost among them "maintenance of family harmony." *Doe*, 332 N.C. at 95, 418 S.E.2d at 514. The policy seeks to preserve parental authority and security of the home and protect the financial resources of the family. *Small v. Morrison*, 185 N.C. 577,

584-85, 118 S.E. 12, 15-16 (1923). In North Carolina, the parent-child immunity doctrine extends to stepparents standing *in loco parentis*, *Morgan v. Johnson*, 24 N.C. App. 307, 210 S.E.2d 503 (1974); *Mabry v. Bowen*, 14 N.C. App. 646, 188 S.E.2d 651 (1972), because applying the parent-child immunity doctrine to the stepparent situation, which is more permanent in nature than those having temporary custody and control, furthers the public policies underlying the doctrine.

Where, however, the interests of the natural parent and child are united, and the child was only with defendants on a temporary basis, it is difficult to see how the policies of avoiding "potential strife between parent and child," of protecting the family's financial resources, and of preserving parental authority and security of the home apply. *Andrews*, 446 N.Y.S.2d at 174. The "rationale behind the rule loses its persuasive force as one considers situations involving other than the actual parent." *Gulledge v. Gulledge*, 367 N.E.2d 429, 431 (Ill. App. 1977) (parental immunity does not extend to those having temporary control and custody of minor such as grandparents or others). Because extension of the parent-child immunity doctrine to one having temporary custody and control of a child would not further the policies underlying the doctrine, defendants are not entitled to enjoy immunity from Liner's wrongful death claim based on the doctrine. *See* Romualdo P. Eclavea, Annotation, *Liability of Parent for Injury to Unemancipated Child Caused by Parent's Negligence—Modern Cases*, 6 A.L.R. 4th 1066 (1981) (discussion of courts that extend parent-child immunity doctrine to persons standing *in loco parentis* and courts that do not). For these reasons, defendants cannot claim they were immune from Liner's wrongful death claim on behalf of Ambra even if we determined defendants stood *in loco parentis* to Ambra, and summary judgment should not have been granted for defendants based on parental immunity.

Dismissed in part, reversed in part.

Judge McCRODDEN concurs.

Judge JOHN concurs in part and concurs in part only in the result with separate opinion.

Judge JOHN concurring in part and concurring in part only in the result.

I concur in the majority's dismissal of defendants' appeal as to plaintiff's negligent infliction of emotional distress claim, but specifi-

cally disagree with and do not join the majority holding that parent-child immunity may not be afforded to persons standing *in loco parentis*. Nonetheless, because I believe the circumstances of the case *sub judice* raise an issue of fact as to whether defendants stood *in loco parentis* to the minor child Ambra, I am compelled to concur in the result reversing allowance of defendants' motion for summary judgment as to plaintiffs' wrongful death claim. However, my vote is to reverse and remand for determination by the trier of fact as to the issue of defendants' status.

Although defendants neither possessed an official governmental license as foster parents nor received any compensation or reimbursement for their care of the child, I believe the majority properly characterizes their relationship vis-a-vis Ambra as that of foster parents. However, the majority suggests that in view of the terminable nature of defendants' association with Ambra and the "temporary" nature of foster care in general, *see* 3 Robert E. Lee, *North Carolina Family Law*, § 238, at 190-91 (4th ed. 1981), neither defendants nor any foster parent could intend *permanently* to assume parental obligations and thus could never stand *in loco parentis*. The majority further relies upon the temporary nature of foster parent status to deny parent-child immunity even to a foster parent who may truly stand *in loco parentis*. In each respect, I must disagree.

First, the very nature of an *in loco parentis* relationship, contrary to natural parenthood or adoption, affixes "rights and duties temporary [as opposed to permanent] in nature," *Miller v. Miller*, 97 N.J. 154, 162, 478 A.2d 351, 355 (1984) (citing *Schneider v. Schneider*, 25 N.J. Misc. 180, 52 A.2d 564 (1947) and *D. v. D.*, 56 N.J. Super. 357, 153 A.2d 332 (1959)). Indeed, we have previously specifically recognized this impermanence. *See Duffey v. Duffey*, 113 N.C. App. 382, 385, 438 S.E.2d 445, 447 (1994) (although an *in loco parentis* relationship "[t]ypically . . . terminates upon divorce," stepfather held to stand *in loco parentis* beyond divorce from mother under circumstances of the case). Additionally, the *in loco parentis* association "exists at the will of the party assuming the obligations of a parent [and] may be abrogated by such party at any time." 67A C.J.S. *Parent & Child* § 154 (1978). Thus, emphasis upon the characteristic impermanence of foster care to support exclusion of foster parents from *in loco parentis* status, itself impermanent, is circuitous at best.

Further, despite the "temporary" nature of *in loco parentis*, both the consequent rights and duties are, "as the words imply, substan-

### LINER v. BROWN

[117 N.C. App. 44 (1994)]

tially the *same* as between parent and child . . . ." 59 Am. Jur. 2d *Parent and Child* § 75 (1987) (emphasis added). Because an *in loco parentis* relationship arises only "when one is willing to assume all the obligations *and to receive all the benefits* associated with one standing as a natural parent to a child," 67A C.J.S. *Parent & Child* § 154 (1978) (emphasis added), imposition of every duty of parenthood without affording those protections recognized in the law is neither consistent nor fair. *See London Guarantee & Accident Co. v. Smith*, 242 Minn. 211, 215, 64 N.W.2d 781, 784 (1954) (stepfather who voluntarily assumed *in loco parentis* position is entitled to same protections and benefits as a natural parent).

As a natural extension of the foregoing principles, this Court, as the majority correctly concedes, has acknowledged *in loco parentis* status and application of parental immunity to circumstances involving stepparents, *see Mabry v. Bowen*, 14 N.C. App. at 647, 188 S.E.2d at 651-52 and *Morgan v. Johnson*, 24 N.C. App. at 308, 210 S.E.2d at 504; *see also Dodson v. McAdams*, 96 N.C. 128, 132, 2 S.E. 453, 453 (1887) (It is "settled law" that the relationship of *in loco parentis* may exist between grandparent and grandchild.).

In addition, other jurisdictions have rejected automatic exclusion of foster parents from the position of *in loco parentis* and accorded them parent-child immunity as well. *See In re Diana P.*, 120 N.H. 791, 796, 424 A.2d 178, 181 (1980), *cert. denied*, 452 U.S. 964, 69 L.Ed.2d 976 (1981) ("To conclude that foster parents can never stand *in loco parentis* to a child in their care would be unrealistic"); *Mathis v. Ammons*, 453 F.Supp. 1033, 1035 (E.D. Tenn. 1978) (uncle stood *in loco parentis* to child who resided with and was cared for by him; to rule otherwise "might have the effect of discouraging the . . . voluntary and unselfish . . . caring for a child in need of parental support and guidance . . . ."); *Brown v. Phillips*, 178 Ga. App. 316, 317, 342 S.E.2d 786, 788 (1986) (where natural parents' custodial rights had been "severed" by the juvenile court and child was placed in custody of county department of family and children services, to allow parents to sue foster parents standing *in loco parentis* for alleged negligence would violate state public policy favoring parental immunity); *Hush v. Devilbiss Co.*, 77 Mich. App. 639, 646-47, 259 N.W.2d 170, 173 (1977) (one "who voluntarily assumes parental responsibility and attempts to create a home-like environment for a child should be granted immunity from judicial interference to the same extent as a natural parent"); *Mitchell v. Davis*, 598 So.2d. 801, 804 (Ala. 1992) ("foster parents should be afforded some protection by the parental

immunity doctrine"); *Rutkowski v. Wasko*, 286 A.D. 327, 331, 143 N.Y.S.2d 1, 4 (1955) ("[n]o good reason" exists why parent-child immunity should be applied to a natural parent and not in the case of one standing *in loco parentis*).

Moreover, as stated in an early decision of this Court, abolishment of parent-child immunity is "for our Legislature or for our Supreme Court," *Evans v. Evans*, 12 N.C. App. 17, 18 , 182 S.E.2d 227, 228, *cert. denied and appeal dismissed*, 279 N.C. 394, 183 S.E.2d 242 (1971), *cert. denied*, 405 U.S. 925, 30 L.Ed.2d 797 (1972), and not for this Court, however meritorious we might find such action. *Mabry*, 14 N.C. App. at 647, 188 S.E.2d at 652; *see also Mayberry v. Pryor*, 422 Mich. 579, 593, 374 N.W.2d 683, 689 (1985) ("The clear judicial trend is to abolish or limit the availability of the parental immunity defense to both parents and other caretakers alike."); *Lee v. Mowett Sales Company, Inc.*, 316 N.C. 489, 494, 342 S.E.2d 882, 885 (1986) ("If the doctrine is to be abolished . . . , it should be done by legislation and not by the Court"); Harlin Ray Dean, Jnr., *It's Time to Abolish North Carolina's Parent-Child Immunity, But Who's Going to Do It?— Coffey v. Coffey and North Carolina General Statutes Section 1-539.21*, 68 N.C.L. Rev. 1317 (1990).

Absent abolition of parent-child immunity, and bearing in mind we are bound by this Court's previous decisions involving stepparents, *see In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), I submit that foster parents may, under appropriate circumstances, stand *in loco parentis*, and if so situated are entitled to the rights and benefits of natural parents, including parent-child immunity.

Among factors which have been recognized as applicable to a determination of whether a party stands *in loco parentis* are "the age of the child; the degree to which the child is dependent on the person claiming to be standing *in loco parentis*; the amount of support, if any, provided; the extent to which duties commonly associated with parenthood are exercised," *Hush*, 77 Mich. App. at 649, 259 N.W.2d at 174-75; the amount of time the child has lived with the person and the degree to which a "psychological family" has developed, *In re Diana P.*, 120 N.H. at 796, 424 A.2d at 180.

In the case *sub judice*, particularly in view of the relatively short period of time the child lived with defendants on a full-time basis, I believe consideration of the foregoing factors raises an issue of fact as to whether defendant foster parents stood *in loco parentis* to

Ambra. *See State v. Hunter* 48 N.C. App. 656, 662, 270 S.E.2d 120, 123 (1980) (evidence, *inter alia*, that child, his mother, and defendant lived together from September 1978 to January 1979 appropriate for jury determination of whether defendant was a person acting *in loco parentis*).

Concerning such determination, the majority cites Michigan authority for the proposition that the "[i]ntent to assume parental status can be inferred from [the parties'] acts and declarations," *Hush*, 77 Mich. App. at 649, 259 N.W.2d at 174, but follows with a recitation of certain acts and declarations of the child's *natural mother* as bearing upon the determination of whether the *defendant foster parents* stood *in loco parentis* to Ambra. I agree it is established that the requisite "intention may be shown by the acts and declarations of the persons *alleged to stand* in [the] relationship [of *in loco parentis*]." 67A C.J.S. *Parent & Child* § 154 (1978) (emphasis added). However, the acts or sentiments of a natural parent do not appear to have been determined relevant either by the Michigan court cited or indeed by any other authority. If so, certain other uncontradicted evidence in the case *sub judice* would be pertinent—for example, Ms. Richardson's refusal to remove her boyfriend from her home following a child abuse investigation concerning Ambra and her later consent to placing custody of the child in DSS.

In sum, I conclude that under our existing law foster parents and those similarly situated may stand *in loco parentis* to a minor child and avail themselves of the parent-child immunity doctrine during the duration of that relationship. Further, the evidence of defendants' status in the case *sub judice* was not conclusive as a matter of law, and there remains an issue of fact as to whether defendant foster parents stood *in loco parentis* to Ambra. Accordingly, I concur in the result of reversal of the trial court's summary judgment in favor of defendants, but rather vote to remand for resolution of the *in loco parentis* issue by the trier of fact.