[Civ. No. 20752. First Dist., Div. Two. Mar. 15, 1963.]

Estate of MARTIN FREDERICK JOSEPH TEDDY, Deceased. ALAN CRANSTON, as State Controller, Petitioner and Appellant, v. RUTH ANNA GIANASSI, as Executrix, etc., Objector and Respondent.

Charles J. Barry, Chief Inheritance Tax Attorney, Milton D. Harris, Senior Inheritance Tax Attorney, and R. Edgar Sanderson, Associate Inheritance Tax Attorney, for Petitioner and Appellant.

Henry C. Clausen, Sheldon C. St. Clair, Henry C. Clausen, Jr., and Clausen & St. Clair for Objector and Respondent.

KAUFMAN, P. J.—Martin Frederick Joseph Teddy died testate on August 13, 1960, naming the respondent, Ruth Anna Gianassi, as executrix and the residuary legatee of the bulk of his estate. On this appeal by the Controller of the State of California from an order of the probate court sustaining respondent's objection to the report of the inheritance tax appraiser and fixing the tax, the only question presented is whether the respondent is entitled to be classified as a Class A transferee under section 13307, or as a Class D transferee under section 13310 of the Revenue and Taxation Code.

The record reveals the following facts: Respondent was born on July 21, 1896. Her natural father died in 1905 and her mother thereafter took in boarders. In January 1911, her mother met the decedent at a party. About two months later, the decedent came to live with respondent, her mother sister and uncle, as a paying roomer and boarder. A friendly relationship developed between the decedent and respondent's mother. Soon thereafter, there was talk of a marriage between the respondent's mother and the decedent. Thus, on the respondent's 15th birthday (July 21, 1911), the decedent was living in respondent's mother's home and paying board and room. Respondent and her sister welcomed the idea of decedent as a stepfather. During this entire period, the decedent paid his board and room, made gifts of clothing and other items to the respondent and her sister, and helped their mother in disciplining them. On July 15, 1913, less than one

week prior to respondent's 17th birthday, the decedent and respondent's mother were married.

The inheritance tax appraiser in his report classified the respondent as a Class D transferee, a "stranger," and taxed her legacy at the higher rate and lower exemption under section 13407 of the Revenue and Taxation Code. Respondent filed her objections to this report, contending that she was entitled to the lower rates and higher exemption provided for a Class A transferee by section 13404 of the Revenue and Taxation Code. The trial court found that the respondent was a Class A transferee pursuant to section 13307 of the Revenue and Taxation Code and accordingly fixed the tax under section 13404.

Appellant contends that the trial court erred as a matter of law, as a paying roomer and boarder cannot stand in the mutually acknowledged relationship of a parent to his landlady's daughter, and that the evidence does not support the conclusion that the respondent has met all of the statutory prerequisites for classification as a Class A transferee.

Section 13307 of the Revenue and Taxation Code provides, so far as relevant: "'Class A transferee' means any of the following: . . . . . . . . . .
(c) A transferee to whom the decedent for not less than 10 continuous years prior to the transfer stood in the mutually acknowledged relationship of a parent, if the relationship commenced on or before the transferee's fifteenth birthday."

 The case is one of first impression, although the above portion of the statute has been in effect since 1905 (Stats. and Amendments to the Codes 1905, ch. CCCXIV, § 2, p. 342). A reading of the statute indicates that subsection (c) contains three prerequisites before the transferee can qualify as a Class A transferee: (1) the existence of a mutually acknowledged relationship of a parent (between the decedent and the transferee); (2) the commencement of this relationship before the 15th birthday of the transferee; (3) the duration of the relationship for 10 continuing years prior to the transfer. As the third item is not in issue here, we will confine our dicussion to the first two requirements. The first requirement of the mutually acknowledged relationship first became law in 1903 (Stats. 1903, ch. CCXXVIII, pp. 268-269), and the second in 1905 (Stats. 1905, ch. CCCXIV, p. 342).

 As our inheritance tax statute was taken bodily from the former New York inheritance tax statute (*McDougald* v.

*Lilienthal*, 174 Cal. 698, 700 [164 P. 387]), the interpretation of the New York courts is relevant as an indication of the qualities which transform an ordinary affectionate relationship into the "mutually acknowledged relationship of a parent." The first case (*In re Moulton's Estate* (1895) 11 Misc. 694 [33 N.Y.S. 578, 1 Gibbons 257]) arose under the New York statute which, like the pre-1905 California statute, required only a mutually acknowledged relationship of a parent. The question was whether a mutually acknowledged parent-child relationship existed between an uncle and his nieces. The surrogate's court concluded that the relationship did not exist, as it appeared that the nieces did not leave their own parents and go to the home of the testator but that after the death of their father, the uncle went to live with their mother and became a member of their household. He contributed his share of the household expenses and while not dependent on them for maintenance, he received at their hands the attention and care one would naturally expect from an affectionate sister and nieces, but he did not make any sacrifice for his nieces and did not support or educate them. The court continued at page 579: "The word 'acknowledged' would seem to indicate that it was necessary that the deceased person had held the person to whom the transfer was made out to the world as a child, or as one to whom he bore that relation, or that he treated and considered such a one as a child; and that the word 'mutually' would seem to require that such a relation was mutual, and that the character of the relation was reciprocal."

The next case, *In re Beach's Estate* (1897) 154 N.Y. 242 [48 N.E. 516], also arose under the old version of the inheritance tax statute after some lower court decisions had indicated that the clause referring to the mutually acknowledged relation of a parent applied only to illegitimate children. The New York Court of Appeals settled the interpretation of the statute by stating that the clause was intended to have a broader scope and to include ". . . those cases, not infrequent, where a person without offspring, needing the care and affection of some one willing to assume the position of a child, takes, without formal adoption, a friend or relative into his household, standing to such person in loco parentis or as a parent, and receives, in return, filial affection and service." (P. 518 [48 N.E.].)

· In the *Beach* case, the legatee was a married lady of middle age living with her husband and who had resided for the

statutory period with the testator and had managed the household affairs of the testator. The court held that the fact that at the inception of the relation, the legatee was adult, did not take the case out of the statute or prevent the existence of the mutually acknowledged relationship of a parent. After the *Beach* case, the New York Legislature amended the statute by inserting the qualification that such relationship began at or before the child's 15th birthday, in order to exclude persons from the beneficial exemption of the statute unless the relationship was formed in the tender years of the legatee.

The parties here agree that the statutory language "mutually acknowledged relationship of a parent" is the equivalent of the concept of a person *in loco parentis*. An early California case (*Starkie* v. *Perry* (1886) 71 Cal. 495, 497 [12 P. 508]) held that where an uncle took his niece into his home to live with him as a member of the family following the death of her mother, the uncle stood *in loco parentis* and in that relation was bound in law to support and maintain her according to his circumstances under section 196 of the Civil Code. ▬▬ Likewise, under section 209 of the Civil Code,[1] it is well settled that a stepparent merely by reason of such relationship to his stepchild does not stand *in loco parentis* to such stepchild. The relationship is established only if the stepfather receives the stepchild into his family and treats it as a member thereof. Then the stepfather stands in the place of the natural parent, and the reciprocal rights, duties and obligations of parent and child continue as long as such relation continues (*Trudell* v. *Leatherby*, 212 Cal. 678, 681 [300 P. 7]). The mutuality and continuity and permanence of the relationship have been recognized as significant factors arising under section 209 of the Civil Code (*Wardrobe* v. *Miller*, 53 Cal.App. 370, 375 [200 P. 77]).

We note that one of the cases which established the concept of *in loco parentis* emphasized the intent to assume duty of the parent to make provision for the child (*Powys* v. *Mansfield* 1836) 40 Eng.Rep. (3 Myl. & C.) 964.) These aspects of the relationship are still significant as illustrated by the majority of cases arising under the National Service Life Insurance Act (38 U.S.C.A. § 701) before the 1946 amendment. The act at that time limited the persons who could be named as bene-

---

[1]This section provides: "A husband is not bound to maintain his wife's children by a former husband; but if he receives them into his family and supports them, it is presumed that he does so as a parent, and, where such is the case, they are not liable to him for their support, nor he to them for their services." [Enacted 1872.]

ficiaries to those standing *in loco parentis* to the serviceman for at least a year prior to entry into the service (3 A.L.R.2d 846, 847). In *Strauss* v. *United States* (2d Cir. 1947) 160 F.2d 1017 (cert. denied 331 U.S. 850 [67 S.Ct. 1741, 91 L. Ed. 1859]), the serviceman had lived with the beneficiary from the age of nine until his enlistment in the Navy. The court, in affirming a holding that the beneficiary did not stand *in loco parentis* to the insured, said at page 1018: ''Without doubt, there was a strong bond of affection between the defendant and insured, but that is not sufficient to establish the fact that she stood *in loco parentis*. There are *certain obligations inherent in the parental relationship to a minor child, obligations which the defendant never undertook to perform, and never showed any intention of performing. Foremost among these obligations is the responsibility for the support of the child.''* (Italics supplied.)

In affirming a similar holding in *Niewiadomski* v. *United States* (6th Cir. 1947) 159 F.2d 683 (cert. denied 331 U.S. 850 [67 S.Ct. 1730, 91 L.Ed. 1859]), the court said at page 686: ''The term 'in loco parentis,' according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the *two ideas of assuming the parental status and discharging the parental duties.* The opinions in both *Meisner* v. *United States, supra,* [295 F. 866] and *Howard* v. *United States, supra,* [2 F.2d 170] accept this view and approve such a definition. It clearly embodies more than furnishing material help to a close relative who is in need. One may be willing to furnish needed assistance to such a relative, even over an indefinite period of time, without being willing at the same time to assume the legal obligation of a parent. Due to the obligations and rights that arise out of such a relationship, the assumption of the relationship does not arise by chance, but is the result of intention.'' (Italics supplied.)

It is clear from the above authorities that the recognized criteria of a mutually acknowledged relationship of parent are the intentional assumption of parental status and the commensurate assumption of parental duties. In the instant case, there was no evidence to indicate that the decedent intended to assume the obligation of supporting the respondent and her sister before the marriage to her mother. It is uncontroverted that he was paying for his room and board which appears to be contradictory of any intent to assume

reponsibility. The fact that before the respondent's 15th birthday, an affectionate relationship existed between her and the decedent, the fact that he gave her birthday and other gifts, and apparently scolded her and her sister on occasion, merely points to an assumption of parental status, without the commensurate assumption of parental duties.

Indeed, as we have pointed out, under section 209 of the Civil Code, the decedent did not automatically assume the reciprocal rights, duties and obligations of a parent upon the marriage to the respondent's mother (*Trudell* v. *Leatherby, supra*). While the latter rule has been criticized by an eminent authority as an anomaly (see 2 Armstrong, Cal. Family Law, ch. X, § 6, note and comment at pp. 1137, 1138, and the recent amendments to § 1508 of the Welf. & Inst. Code, cited at p. 395 of the 1961 supplement), it was unquestionably the law at the time here relevant. Thus, even after marrying the respondent's mother, the decedent under section 209 of the Civil Code did not stand in the mutually acknowledged relationship of a parent—he had to receive her into his home and voluntarily assume the obligations of a parent, chief of which is the obligation to support and maintain the child. Respondent cites *Buelke* v. *Levenstadt,* 190 Cal. 684 [214 P. 42], to argue that the payment of room and board was not contrary to the existence of the relationship of *in loco parentis.* In that case, the defendant had signed his nephew's driver's license application, and the question before the court was whether in so doing, he had assumed liability for the minor's negligence. This in turn depended on whether the uncle stood *in loco parentis* to the nephew. The nephew had come to live with the uncle when he was 12 years old. At the time of the litigation, the nephew was 19 and employed by the uncle, who owned a grocery store, as the driver of the delivery truck. The court upheld a ruling that the uncle stood *in loco parentis* to the nephew.

This argument of the respondent overlooks the fact that in the instant case, aside from the requirement of the existence of the relationship, she must meet the second requirement of section 13307, subdivision (c) of the Revenue and Taxation Code, which is that the mutually acknowledged relationship must commence *on or before the 15th birthday of the transferee.* Here, on the respondent's 15th birthday (July 21, 1911), the decedent had been living in the home of respondent's mother as a roomer and boarder for only a few months.

We think that on this point, the instant case is on all fours

with *Posler* v. *State* (1957) 11 Ill.2d 557 [144 N.E.2d 589]. The pertinent Illinois inheritance tax statute, like ours, provided a lower rate of tax and a higher exemption for any person to whom the decedent, for not less than 10 years stood in the acknowledged relation of a parent, provided, however, such relationship began at or before said person's 15th birthday and was continuous for said 10 years thereafter.

The decedent was the stepmother of two beneficiaries, both of whom were past their 15th birthday when their father and the decedent married. In affirming the higher rate of tax and denying the exemption, the court said at page 590 [144 N.E.2d] : ''While the other conditions of the statute have been met, it is undisputed that both beneficiaries were over fifteen when the decedent married their father. To meet this deficiency the appellants point to testimony that in September of 1920, before Marian was fifteen, the decedent helped her shop for clothes and selected clothes for Richard, and that beginning shortly after their mother's death, the decedent had dinner at least once a week, and sometimes oftener, with the children and their father. These circumstances, however, fall far short of showing that decedent, prior to her marriage with the children's father, stood in the 'acknowledged relation of a parent.' There is no evidence that the decedent assumed any significant duties of parenthood before the children became fifteen. Nor is the fact that a wholesome and happy relationship existed between the children and their stepmother over the many years that followed her marriage to their father an effective substitute for compliance with the statute.''

The court also upheld the constitutionality of the statute, saying at page 590 [144 N.E.2d] : ''The case of the acknowledged child is an exception to the close ties by blood or marriage that are otherwise required to qualify for the lowest rate and the highest exemption. It is also a legislative recognition that under certain circumstances there can be a relation between adult and child that has qualities sufficiently like those that exist in the case of natural parents to warrant like treatment. The legislature described that relation as 'the acknowledged relation of a parent,' and laid down specific requirements as to its inception and its duration.

''The appellants concede that the requirement that the relationship shall have been continuous for ten years is valid. But they contend that the requirement that the relationship must have commenced before the child's fifteenth birthday

is arbitrary. We do not agree. In our opinion the legislature has the same power to fix the inception of the relation as it has to fix its duration. A legislative determination that the earlier the relationship begins the more likely it is to assume the attributes of the relation between natural parents and their children can not be said to be unreasonable.''

 Similarly, in the instant case, there is no evidence that the decedent assumed any of the obligations of parenthood before the respondent became 15. The evidence relating to his assumption of such duties and responsibilities in the 40 years after his marriage to the respondent's mother is not relevant to the question before us.

In view of the foregoing, the order is reversed, with directions to the trial court to enter an order that respondent was a Class D transferee and to fix the inheritance tax accordingly.

Shoemaker, J., and Agee, J., concurred.

A petition for a rehearing was denied April 1, 1963, and respondent's petition for a hearing by the Supreme Court was denied May 8, 1963.