83 N.J. Super. 480 (1964)
200 A.2d 493
IRMA M. TOFANI, PETITIONER-RESPONDENT,
v.
LO BIONDO BROTHERS MOTOR EXPRESS, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 6, 1964.
Decided April 22, 1964.
*481 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. William T. McElroy argued the cause for appellant (Messrs. Pindar, McElroy, Connell & Foley, attorneys).
Mr. David L. Horuvitz argued the cause for respondent (Mr. Isaac I. Serata, attorney; Mr. William P. Doherty, Jr., on the brief).
PER CURIAM.
The following opinion was rendered for the Middlesex County Court in this matter.
"This appeal brings up for de novo review the record in the Division of Workmen's Compensation. The judge of compensation dismissed the petition. Factually, the case is one of novel impression in New Jersey to the extent that decedent owned a tractor, leased it to respondent and drove it while hauling a trailer owned by respondent and in the course of the operation of respondent's business.
The sole issue is whether decedent was an employee. The Division held he was an independent contractor stating briefly that `the relationship of master and servant exists whenever the employer retains the right to direct the manner in which the business or work shall be done as well as the results to be accomplished' and concluded `the testimony  is clear that decedent was not an employee  but in fact was an independent contractor.' (Emphasis supplied)
I find the essential facts and legitimate inferences reasonably to be drawn to be as follows:
Decedent owned a tractor and did trucking for a living. Respondent's corporation was a freight carrier with equipment and approximately 50 employee-drivers on its payroll paid by the hour. In addition, respondent's business warranted leasing of other equipment such as decedent's. A lease agreement dated March 31, 1960, expiring June 30, 1960 was signed by decedent and respondent. It provided for:
`1. Leasing the "Equipment to the Carrier" to be used exclusively in its business * * * commencing when possession is taken "as shown herein."
2. Lessor to maintain and keep equipment in good repair and provide gas, oil, tires and other necessary equipment and furnish a competent and qualified driver and helper(s) if necessary and compensate such driver and helper(s), such compensation to * * * *482 include all wages, taxes, insurance including social security, workmen's compensation and withholding taxes.
3. During the period of this lease exclusive possession, control and use of equipment shall be in the carrier and the carrier assumes * * * full responsibility in respect of said equipment to the public, the shippers and Interstate Commerce Commission.
4. Upon expiration * * * possession of the equipment will promptly be restored to lessor in * * * condition as when received * * * ordinary wear and tear excepted; provided * * * carrier * * * not liable for any loss or damage or destruction while * * * operated by or in care and control of the driver and helper(s) furnished with the equipment.
5. Carrier will pay * * * and lessor agrees to accept as compensation for the equipment and for the services of the driver or helper (s) the compensation shown above.'
The `schedule of compensation' was not affixed. The lease provided `possession taken on 3-31-60, 6:00 A.M.' The lease was entitled `Equipment Lease, Receipt and Inspection Report.' The `receipt' indicating delivery of possession and the `inspection report' indicating the equipment not defective as certified by carrier after careful inspection.
Respondent was responsible for the equipment's being safe for operation and decedent was `not supposed to' haul for anyone else during the period and trips would originate from respondent's terminal or other points of origin directed by respondent and the shippers loaded the truck. Respondent furnished its trailer, hauled by decedent's tractor as leased and decedent met with an accident on New Jersey Turnpike in East Brunswick Township while returning unloaded from a trip for respondent to Connecticut on May 27, 1960 and died on June 2, 1960. In some areas a union driver was required and respondent arranged for one in advance who met decedent on arrival at such point. Decedent was `given papers for a certain load and instructed to deliver to a certain city or town.' Payments were made weekly to decedent by check in various amounts and were based on tonnage hauled and distance. Decedent was to call respondent's office on delivery to learn if another load was to be picked up and brought back and if there was none he could solicit a return load himself for which respondent did the billing, paid decedent and deducted a charge for the use of its trailer. The records of the Tofani arrangement were submitted to the I.C.C. Decedent could not refuse any loads. He had no discretion but had to wait his turn for a load. Respondent `filed insurance coverage' and procured identification plates in states where required such as Connecticut but would charge the cost to decedent. No social security, withholding tax or unemployment compensation was deducted. Respondent being a `regulated motor carrier' paid mileage taxes in states where required. Decedent kept a log required of all motor carriers by the I.C.C. which controlled the number of hours he drove `to comply with safety rules of the I.C.C.'
*483 Another `lease' for 30 days between the parties had expired sometime prior to the present one.
The extent of respondent's control over the details of decedent's work is in the main left to inference. Respondent's general manager testified as a witness (hostile) for petitioner that `we do not have full and complete control because this is what you call an "owneroperator" and in that case the owner has control as far as * * * it's our responsibility to see that equipment is safe for a safe operator.' When an owner-operator leaves on a trip, then he is on his own, in other words, until he gets back from the trip. He is not supposed to `haul for anybody else during the period.' The equipment was continually used in connection with respondent's business `insofar as there was work available.' If decedent needed help, and couldn't obtain it, respondent would hire the help and deduct cost of same from decedent's check. If union help was required in an area, respondent arranged for putting a union driver on the truck and the cost was again deducted; and routes would not be prescribed by respondent. The general manager further stated that respondent could not put another driver on the equipment; that on an occasion decedent was put on the regular payroll as a driver of its own equipment when its driver was sick or on vacation. Decedent was paid by the tonnage and distance, e.g. $5.50 per ton to Scranton and $9.50 per ton to Buffalo. Respondent reserved the right to fire if decedent could not perform. Respondent had I.C.C. rights for general commodities in certain areas and specific commodities between other points. Decedent had no choice as to what he would carry or where he would deliver it. On cross-examination by respondent's counsel, Mr. LoBiondo, the general manager, stated that decedent was obliged to supply a driver and helper and if union regulations required it, decedent supplied such driver and it was charged against him. Respondent would deduct from decedent's checks any money advanced and for gasoline and oil it furnished, and money advanced for help at his request and for identification tags in Connecticut and other states. Prior to this arrangement with respondent, decedent operated for other trucking lines. Decedent kept a daily log required by I.C.C. regulations for safety measures to assure he drove no more than 10 hours in any 24. Decedent was paid:

 $ 60.50 on March 11
 407.02 on March 18
 167.02 on March 31
 156.24 on April 8
 255.46 on April 14
 161.43 on April 22
 267.14 on April 29
 297.34 on May 6
 324.39 on May 13
 512.48 on May 20
 487.26 on May 27 as net payments

*484 The check-off list on the back of the lease was required by I.C.C. safety regulations and respondent checked the equipment at its garage and if it passed, a lease was drawn and the truck could be sent out.
The Teamsters Union decided if a helper or `city man' was to be put on the truck.
On Re-cross it was stated that no social security or workmen's compensation deductions were made (except on the one trip when decedent drove respondent's equipment) and no income tax was withheld.
The lease agreement, the log, letter dated June 13, 1960 from respondent to Mrs. Irene Tofani (enclosing a check and advising her that the matter was being investigated by the compensation insurance company), death certificate, birth records of the three surviving children and the medical bills were in evidence as well as the marriage certificate and funeral bill.
Petitioner, Mrs. Tofani, testified that she kept her husband's books and that he owned a tractor and engaged in trucking for a living and owned no other equipment in March of 1960; that he worked for LoBiondo in 1959 during a strike. She identified the log as in her husband's writing; that decedent worked for no one else during March 31 to May 27, 1960. `He worked for no one else during that period.' Decedent was returning from a trip to Connecticut for respondent.
The issue here is one of status. There seems to be no single unfailing rule in the determination of status as an employee rather than independent contractor. No particular fact can be called controlling. Precedents are found on both sides of almost every conceivable situation and diverse results are difficult to reconcile. See C.J.S. [Workmen's Compensation], pp. 316, 317, 318.
An independent contractor is one who contracts to do a piece of work according to his own methods and without control of the employer as to means by which the result is to be accomplished but only as to the result of the work. Errickson v. F.W. Schwiers Jr. Co., 108 N.J.L. 481 (E. & A. 1931).
`Control' has been the historical test, and we find its genesis in tort and contract wherein common-law tests were applied, (C.J.S. [Workmen's Compensation], pp. 317, 318) before workmen's compensation acts and the social conception of industry's absorption of the loss (to labor resulting from injury occurring in the course of employment), with the ultimate cost being paid by the consumer.
Our statute, N.J.S.A. 34:15-36 defines employer as synonymous with master and it includes natural persons, partnerships and corporations; and employee as synonymous with servant and it includes all natural persons including officers of corporations who perform service for an employer for financial consideration.
The status of those who perform services for another branches out into one of two areas of legal relationship. The dichotomy leads to either employee or independent contractor.
*485 Compensation coverage has extended the term `employee' beyond the common-law concept, distinguishing servants from independent contractors in vicarious liability situations.
The `right to control' test is weighted with a summary of tests which have generally been adopted in the Anglo-American world. (See Restatement of Agency, 2d Sec. 220 and Larson, The Law of Workmen's Compensation, (1961) § 43.10).
Professor Larson has analyzed and reviewed employment status in Vol. I, Chapter VIII, § 43.00 et seq. and the following extracted from his works (with some minor variations of my own), together with his authorities as well as the trend in our own State, leads me to my conclusion.
The definition of the term `employee' has probably produced more reported cases than any definition of status in the modern history of law. The common-law definition usually consists of a listing of relevant characteristics or tests with caveat that all except the control test are merely indicia pointing one way or the other. Restatement of Agency, sec. 220 summarizes the typical tests practically agreed on in the Anglo-American world as (Larson § 43.10):
`(1) A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control.
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer; and
(i) whether or not the parties believe they are creating the relationship of master and servant.'
On only one point as to relative weight of the various tests is there an accepted rule of law: it is constantly said that the right to control the details of the work is the primary test. Where some of the above listed factors point one way and some the other, a court must follow some mental weighing process according to some principle. What, in compensation cases, is the underlying principle that tips the scales in *486 close situations? What influences the decisions, i.e., what underlying forces are shown by the broad trend of compensation decisions? Larson § 43.30.
The `servant' concept at common law performed one main function, to delimit the scope of a master's vicarious tort liability to a third person. By contrast, compensation law is concerned with injuries to him (the servant). To this issue, the right to control of details of his work has no such direct relation as it has to the issue of vicarious tort liability. (Larson § 43.42). If then, control of the details of the work should not be the most relevant factor, which of the listed factors should be? The answer should be, the nature of the claimant's work in relation to the regular business of the employer. Larson § 43.50.
Under the control test, the right to control is usually inferred from direct evidence of right of control and exercise of control; right of termination; method of payment; and who furnishes the equipment. Under the relative nature of the work test are considered: whether the work done is an integral part of the employer's regular business; and whether the worker, in relation to the employer's business, is in a business or profession of his own. (Larson § 43.53).
It is unfortunate that, the primary test of the right of the employer to control the details of the work is seldom a demonstrable fact, while the other subordinate tests are usually provable features of the employment. The right to control is most often an inference rather than a solid fact in itself. (Larson § 44.00).
If the control factor depended on the degree of control actually exercised, it would be more readily subject to proof. But the test is based on the right, not the exercise. (Larson § 44.10). Of the four factors evidencing right of control, any single one is virtually proof of the employment relation; while contrary evidence as to any one factor is at best only mildly persuasive evidence of contractorship and sometimes is of no force at all. Independent contractorship, then, is established usually only by a convincing accumulation of these and other tests, while employment can, if necessary, often be solidly proved on the strength of one of the four items: direct evidence of control, method of payment, furnishing of equipment and right to fire (Larson § 44.30, 44.31).
When the employer furnishes valuable equipment, the relationship is almost invariably that of employment. When the employee furnishes such equipment, this circumstance may, if coupled with other factors, indicate independent contractorship, but in itself it is not necessarily fatal to a showing of employment based on other grounds. (Larson § 44.34). However, this test refers only to equipment of considerable size and value, not items like trowels and hammers. The most common example is the prolific problem of truck drivers. The direct relation between furnishing of equipment and the inference of right of control, is again, a simple matter of common sense and business. The owner of a five thousand dollar truck who entrusts it to a *487 driver is naturally going (to retain the right) to dictate details in order to protect his investment. Moreover, he will also want to ensure that it is kept as busy as possible. For these reasons, it is not surprising that there seems to be no case on record in which the employer owned the truck but the driver was held to be an independent contractor. (Larson § 44.34).
In fact the same arguments have been applied with the same result even when the employer owned only half the equipment. It is apparently becoming quite common for employers to own a fleet of trailers, and to contract with owner-drivers of tractors to haul the trailers. In spite of a flat rate paid for the services of a driver and rental of a truck, the growing tendency is to classify owner-drivers as employees where they perform continuous service which is an integral part of the employer's business. (Larson § 44.34).
It is my judgment that application of the foregoing principles on `control' leads (inescapably) to the finding of an employer-employee relationship here. The subordinate test of employer's ownership of substantial equipment (the trailer) as well as `exclusive' possession of the tractor (per lease) points circumstantially and by inference to the employer's right of control. The service was continued and not for one trip. Wilson v. Kelleher Motor Freight Lines, 12 N.J. 261 (1953), is distinguishable on this feature alone. There the contract was for `one outbound trip' and the court there found control absent. In Burdick v. Liberty Motor Freight Lines, Inc., 128 N.J.L. 229 (Sup. Ct. 1942), decedent leased his entire equipment for one trip giving lessee exclusive control and decedent was held an employee.
In Western Express Co. v. Smeltzer, 112 A.L.R. 74, 88 F.2d 94 (6 Cir. 1937), the owner of a tractor hauling a load for the owner of the trailer was held a servant of the trailer owner for the purpose of tort liability, the holding being that the evidence warranted the jury in so finding.
Likewise, an operator furnished with the derrick rented to another, was held to be an employee of the lessee of the derrick where the lessee company controlled the operator. Errickson v. Schwiers, Jr., supra.
A little reflection demonstrates convincingly that ownership and `lease control' of the tractor-trailer, unclouded by all other practical irrelevancies, is the heart of this case. An independent contractor being one who operates independently of the employer as to the means or methods used and responsible only as to the result, what means or methods did decedent have to perform his work as contractor? He was stripped of control of his tractor and never had control of the trailer. It is true he remained with the responsibility of damage and keeping the tractor in good repair and furnishing gas, oil, tires and necessary equipment. This was hardly an asset but rather a `set-up' relieving respondent of costs while retaining legal control of the operation. He was left only able to render a service without the tools of trade characteristic of a contractor and lost his identity as such.
*488 In American Carrier Corporation v. Avialiano [Avigliano], 123 N.J.L. 490 (Sup. Ct. 1939), decedent purchased a truck and trailer from respondent and hauled for respondent for a specified amount per ton, decedent to assume all expenses. Apart from destination, no other instructions were given and decedent operated, under interstate commerce rules, under respondent's name as he had no `rights.' The route was prescribed and the truck loaded by respondent who also sent an employee along with decedent. It was held that the evidence showed such control as to negative independent contractor status. That the route was prescribed and an employee sent along distinguish this from the matter sub judice since it is clearly inferable that LoBiondo had the undoubted right (by inference) to prescribe a route for the operation of its equipment and an employee sent along would seem to make no apparent difference. In fact an employee sent along with a driver to direct the driver as to places of delivery was held not to convert the driver into an agent of the company hiring the vehicle. See Lacombe v. Cudahy Packing Company, 103 N.J.L. 651 (E. & A. 1927).
The factors of no income tax, social security, unemployment compensation, withholding and decedent's payment of fuel, repairs and tolls are mere distractions, which become meaningless where complete ownership and control of equipment for the business operation were respondent's. It becomes desirable to place less reliance upon variable items which can be altered at will without changing the basic nature of the relationship. Inexorable tests lead to more certainty and less confusion. `Ownership of the equipment' commends itself as capable of positive proof and more apposite, as being unlikely to be manipulated, and tends to stabilize proof of basis of status in such cases. Furthermore, a workingman and his family should be enabled by the law to better know in advance where they stand in the event of economic emergency or tragedy. This cannot be if their rights remain subject to the vagarious legal significance of details largely controlled by an employer. See Hannigan v. Goldfarb, 53 N.J. Super. 190 (App. Div. 1958).
A railroad engineer, the captain of a vessel and an air pilot are in varying degrees in as complete control as can be imagined, nonetheless it is not debatable that they are subject to the right of their employer to control them if and when it becomes necessary.
`The requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be done and the capabilities of the particular person doing it.' Marcus v. Eastern Agric. Association, Inc., 58 N.J. Super. 584, at p. 597 (dissenting opinion, at p. 596 adopted by Sup. Ct., 32 N.J., at p. 460). `Lack of control may be absent because of want of necessity for its presence.' See DeMonaco v. Renton, 18 N.J. 352 (1955) (for the principle and not as factual parallel).
The `control' test has been treated above with the result based upon the subordinate item of `who furnished the equipment.' This *489 shibboleth of `control' is being subordinated however in close situations to the `relative nature of the work' test. Larson consolidates all tests under `control' or `nature of work' but cautions that they are not susceptible of application as mechanical tests but are inextricably intertwined. (Larson § 43.53)
The fading process of the former, however, is more implicit than explicit. (Larson § 43.54)
In our own State, both Marcus and Hannigan have adopted this approach. While factually dissimilar they fix the philosophy and symbolize or typify the trend. The reasons for the new approach are stated to be logical irrelevance of the tort-connected test of control to the objectives of social legislation and the vagueness of the control test due to absence of agreement or the rules as to the weight applied to various features and from the fact that the right of control is itself an inference or conclusion seldom capable of direct proof. Moreover, the advent of social and labor legislation has increased the effort of employers to avoid both the financial cost and the bookkeeping and reporting inconvenience and results in subcontracting with arrangements carefully drawn with an eye to the control test and willingness to relinquish a considerable degree of control. Consequently decisions evince an unexpressed conviction that if the proper scope of workmen's compensation is not to be defeated, a different criterion based on the realistic nature of the work must be given more weight. (See Larson § 45.10)
`Effectuation of the policy of the statutes in that category (social legislation) requires that their use of the term "employee" not be accorded a constrictive and mechanical definition but rather one geared to comport with the specific statutory purpose.' Hannigan v. Goldfarb, supra [53 N.J. Super.], at pp. 194-5.
`The purpose of workmen's compensation legislation, says Larson (op. cit. supra, § 43.51, p. 632), "* * * is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product. It follows that any workers whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the area of intended protection." And see Tocci v. Tessler & Weiss, Inc., 28 N.J. 582, 586 (1959). The test in the type of case before us here must, therefore, be essentially an economic and functional one, and the determinative criteria not the inconclusive details of the arrangement between the parties, but rather the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business. This court has already recognized the "logic, clarity and forthrightness" of the "relative nature of the work test," i.e., whether or not the work is a part of the regular business of the employer  especially where the worker is one in the general category meant to be protected by the act *490 but whose right to protection is questionable under strict application of common-law principles. Hannigan, supra (53 N.J. Super., at p. 206); Westover v. Stockholders Publishing Company [9 Cir.], supra (237 F.2d [948], at p. 951). The trend of other jurisdictions is toward the acceptance of this test where helpful. See Larson (op. cit., supra, § 43.54, p. 635).' Marcus v. Eastern Agric. Association, Inc., supra [58 N.J. Super.], at p. 603.
Can decedent be considered a going economic separate entity apart from respondent? He owned no trailer at the time and his `status must be adjudged as of the conditions existing when he was injured.' See Marcus [58 N.J. Super.], p. 604. The risk of loss and opportunity for profit, present in the case of an independent contractor, was absent after Tofani leased his tractor. He thereafter, for all intents and purposes, became a worker.
The `relative nature of the work' is tested by whether the work is an integral part of the employer's business and whether the worker furnishes independent business or professional service. A quarry operator contracting out his entire job and a dairy contracting the entire cheesemaking operation were both held to be employer-employee relations. A clown under contract in a circus as an `independent contractor' was held an employee (being the heart of the circus). See Larson § 45.21 and cases cited.
The hauling of logs and the like have usually been classified as part of the employer's business bringing truck owners, paid by quantity free to hire assistants and in some cases working on their own time, within the act. (Larson § 45.22). In Gordon v. New York Life Insurance Co., 300 N.Y. 652 [90 N.E.2d 898] (Ct. App. 1950), control was clearly absent; nevertheless, salesmen were held employees on the theory that the company was getting its basic business accomplished through the employee. The nature of the work test was met while every control test was absent.
A truck owner picking up laundry for a cleaning establishment and delivering it when ready was held an employee on the unexpressed conviction that picking up and delivery were a normal part of the business. Aetna Casualty & Security v. Daniel, 80 Ga. App. 383 [55 S.E.2d 854] (Ct. App. 1949). In Cooper v. Colonial Ice Company, 230 N.C. 43 [51 S.E.2d 889] (Sup. Ct. 1949), an ice-man, not owning the wagon, bought the ice from employer and sold for a profit, with privilege of returning unsold ice. His business consisted of serving orders received by employer and business he himself could get. He was held an employee.
Whether a worker furnishes an independent business is determined by judging how independent, separate and public his business is and not by merely looking at the artisan or job alone. Such employments cover services generally. When all items such as simultaneous carrying on of other contracts, absence of necessity for the contractor to personally do any physical work, and advertising and holding himself out to the public as furnishing this business service, point toward *491 independent contractorship, they can be offset by showing the employer has taken over this otherwise independent contractor and so to speak, by making him one of the cogs in his production machine, converted him to the status of employee for purposes of that particular employment. (See Larson § 45.31b)
Both the control test and the relative nature of the work test bring decedent within the ambit of our compensation law.
A customary aspect of independent contractor status, namely the performance of a specific piece of work, is lacking here. Decedent was working regularly for the term fixed and exclusively for respondent. (See Marcus [58 N.J. Super.], p. 601.)
Larson says `the basic purpose for which the definition [of "servant"] is used in compensation law is entirely different from the common law purpose.' (Larson § 43.42). This appears to be so without further elaboration here and since control of details should not be the most relevant factor due to the differing objectives of vicarious tort liability at common law compared with workmen's compensation solution (of the serious impact) of injury to the workman (as an economic factor in society), Larson submits that the most relevant factor should be `the nature of the claimants work in relation to the regular business of the employer' (Larson § 43.42-43.50). This reasoning adopts the theory that the cost of industrial accidents should be obsorbed by the consumer.
Thus the `relative nature of the work' test and its ingredients support the modern decisions as the really decisive factor. (Larson § 43.53)
The `control' test is being subordinated to the `nature of the work' test. Marcus v. Eastern Agric. Association, Inc., supra; Hannigan v. Goldfarb, supra; Gordon v. New York Life Insurance Co., supra.
Where it is not in the nature of the work for the manner of its performance to be within the hiring party's direct control, the factor of control can obviously not be the critical one in the resolution of the case, but takes its place as only one of the various potential indicia of the relationship which must be balanced and weighed in determing what, under the totality of the circumstances, the character of the relationship really is. Marcus v. Eastern Agric. Association, Inc., supra.
The `log' and carrier's `inspection,' being requisites of I.C.C. regulations do not lend force to respondent's position, but if anything indicate governmental control due to the nature of respondent's operation and not that of the employee and this is so without getting into the question of the legal effect of I.C.C. requirement that a driver be an employee of carrier. (See American Carrier Corporation v. Avialiano [Avigliano], supra.)
Did the parties believe they were creating a master-servant relationship? While neither party has argued for or against such understanding, I make this additional observation. Respondent's letter to Mrs. Tofani advising her that she would be notified as soon as any *492 information was received clearly inferred that respondent reported the matter to its compensation carrier, indicating circumstantially that it did not take as firm a position at that time as it does now.
While I do not emphasize this factor as essential to the result, it must be conceded that such conduct was against respondent's present interest and does not lend force to its present position. Vacillation from a position of (at least) uncertainty to one of (inexorably) `independent contractor' detracts from any view that respondent believed it was not creating a master-servant relationship.
`Neither the compensation authorities nor the courts should be solicitous to put a claimant in the position of an independent contractor when a reasonable view of the evidence warrants a finding that the injured person was an employee.' 99 C.J.S. [Workmen's Compensation], p. 318.
I am of the opinion that the principles outlined herein and the policy lead to the conclusion that decedent occupied the status of employee while driving for respondent during the term of the lease agreement.
Since award and allowances must be fixed, counsel will advise me within 10 days of their view of the manner in which these items should be handled and if, agreed upon, judgment shall be entered in accordance with such disposition; otherwise I will fix same on appropriate application. Following either event, judgment shall be presented with consent of respondent as to form."
We affirm the judgment essentially for the reasons stated in the opinion of Judge Schwartz rendered for the Middlesex County Court. However, we comment briefly on certain of the contentions set forth in the able and comprehensive briefs of the appellant.
It is argued that the opinion of the County Court "constitutes the remaking of a contract entered into by parties who were both experienced in the trucking business, a contract not ambiguous in terms, and one clearly understood by both as not creating an employment situation." This is not an accurate characterization of the disposition by the court of the contract of lease as a factual element of the controversy. This was not an action for breach of contract but a proceeding wherein the court was called upon to decide whether the relationship between the parties as revealed by the whole factual complex was that of employment, within the controlling decisions interpreting the Workmen's Compensation Act.
*493 It is readily to be conceded that some aspects of the lease agreement, if considered in isolation, point to a relationship of independent contractor. But the lease does not purport necessarily to fix the nature of the relationship between such drivers as the lessor may provide under the lease agreement and the lessee. Here Tofani not only leased the use of his manned tractor to LoBiondo, but personally undertook the sole operation of that tractor on a regular and continuing basis, thereby becoming a working cog in the conduct of LoBiondo's regular business. His factual status in that regard stands separate from and independent of his status as the lessor of a piece of equipment. In the latter regard he was a businessman  a renter of equipment; in the former, a workman. If under its policy and social philosophy the workmen's compensation act assimilates his status as a workman to the relationship of employment with LoBiondo, his entrepreneurial character as renter will not derogate therefrom. We find this to be the case here.
For the period of time he placed himself under engagement to LoBiondo, Tofani was economically dependent on LoBiondo; he was not conducting a separate and independent business, at least during that period; and his work constituted an integral part of the regular and continuous functioning of the LoBiondo trucking enterprise. The "relative nature of the work test" for determination of the employment relationship for purposes of workmen's compensation is therefore here met, albeit not as strikingly as in the case of the chick-raiser involved in Marcus v. Eastern Agricultural Ass'n, Inc., 32 N.J. 460 (1960), reversing on dissenting opinion in 58 N.J. Super. 584, 596, 603-604 (App. Div. 1959). See also Hannigan v. Goldfarb, 53 N.J. Super. 190, 206 (App. Div. 1958).
Appellant emphasizes the assertedly high earnings of Tofani, said to have averaged $275 weekly during the period of association with LoBiondo (we make it $258 over the whole period from March 3 to May 27, 1960), as contrasted with the lesser earnings of the drivers on LoBiondo's regular payroll. *494 However, this overlooks that a substantial part of this return must be considered payment of rent for the use of the tractor. Moreover, it is not inconsistent with the employment relationship that the employee is in a relatively highly paid craft.
Appellant also stresses the fact that under the lease agreement Tofani was to carry workmen's compensation insurance for any drivers supplied to operate the tractor. We agree that this circumstance has weight on the side of the independent contractor hypothesis. However, it cannot control the result. If the factual complex as a whole preponderates for the conclusion of employment, as here we are satisfied it does, the employee obviously cannot bargain away his statutory rights by agreeing to provide his own compensation insurance.
Judgment affirmed.