# NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION ET ALS., PLAINTIFFS, v. STATE OF NEW JERSEY ET ALS., DEFENDANTS.

Superior Court of New Jersey
Chancery Division Atlantic County

Decided January 4, 1982.

*R. Alan Aslaksen,* attorney for plaintiff New Jersey Property-Liability Insurance Guaranty Association.

*William V. Kelly* for defendant State of New Jersey (*Starkey, Kelly, Cunningham, Blaney & Ward,* attorneys).

*Mary J. Maudsley,* for defendants Elwood Bell and Lillian Bell (*Cooper, Perskie, Katzman, April, Niedelman & Wagenheim,* attorneys).

*Angelo J. DiCamillo* for defendants Elwood Bell and Lillian Bell (*Riley & DiCamillo,* attorneys).

*Seth Grossman* for infant plaintiff Nathaniel Rodger Murray.

GIBSON, J. S. C.

■ This is a declaratory judgment action in which the central issue is whether foster parents are considered employees of the State for purposes of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–3. Based on common-law principles as well as statutorily based public policy, it is the conclusion of this court that they are. The issue comes before the court as a result of plaintiffs' motion for summary judgment. *R.* 4:46–2. The facts which are material to that motion are not in dispute and are summarized below.

Between 1971 and 1978 Elwood and Lillian Bell acted as approved foster parents for the State of New Jersey. In July 1978 their names appeared on a list of qualified persons willing to accept foster children on an emergency basis. On or about July 22, 1978 Atlantic City police found two juveniles, Nathaniel Murray and his sibling, apparently abandoned. The children were turned over to the Division of Youth and Family Services (hereinafter DYFS), which, in turn, placed the children with the Bells on a temporary basis. A complaint was then filed with the Juvenile and Domestic Relations Court of Atlantic County seek-

ing the appointment of DYFS as guardian for the children. The application was approved. Pursuant to that court order and the prior placement, the children remained with the Bells until the natural parents were located.

On July 30, 1978, while still with the Bells, Nathaniel was injured when a bucket of hot water accidentally spilled on him. When he was returned to his natural parents they instituted suit in the Law Division of the Superior Court seeking damages against both the State and the Bells. A defense was entered in behalf of the Bells through the New Jersey Property-Liability Insurance Guaranty Association, predecessor to the Bells' carrier under a homeowners' policy. The State was represented by a carrier under a policy covering "Foster Parents Personal Liability," but refused to defend the Bells. As a consequence, the Guaranty Association instituted a separate suit in the Chancery Division seeking to compel the State to assume the defense of the Bells and to indemnify them for any loss. Those two cases were later consolidated. The Guaranty Association and the Bells now move for summary judgment.

Under the terms of the New Jersey Tort Claims Act the Attorney General is required to defend any state employee who is sued as a result of an act or omission which occurred while the employee was within the course of employment. *N.J.S.A.* 59:10A–1. If wrongfully refused, the employee is entitled to indemnification for defense costs plus reimbursement for any judgment or settlement. *N.J.S.A.*59:10–2. The State contends that the Bells may not benefit from these provisions because they were not employees, but rather independent contractors. Under the definition section of the statute "employee" is defined as follows:

> "Employee" includes an officer, employee, or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor. [*N.J.S.A.* 59:1–3]

Although this definition is quite broad, it does not, by itself, answer the question posed here. An examination of common-law principles is necessary.

In order to ascertain the status of an individual worker for purposes of determining vicarious liability or the availability of statutory benefits, one most normally look to a combination of factors. 1 *Restatement, Agency* 2d, § 220 (1958). The number and variety of such factors may be considerable, and a great deal of litigation has resulted from their application. In fact, it has been said that disputes over classification have "probably produced more reported cases than any definition of status in the modern history of law." *Larson, The Law of Workmen's Compensation,* § 43.10 at 81 (1980). Nevertheless, there do not appear to be any reported cases which deal with the status of foster parents. The only reported decision dealing with status under the Tort Claims Act involves a municipal attorney. He was held to be an employee, but no reasons were given. *Martin v. Rochelle Park Tp.,* 144 *N.J.Super.* 216 (App.Div.1976).

Under common law, one of the most critical and frequently cited guidelines in the area of worker classification is that of "control." 41 *Am.Jur.*2d, *Independent Contractors,* § 5 (1968). The decisive question in that regard is who has the right to direct what shall be done, and when and how it shall be done. *Id.* at 744. In the case at bar there was a written agreement between DYFS and the Bells which purports to reflect their relative responsibilities. An examination of that agreement reveals the fact that the control maintained by DYFS was considerable. Although the Bells were responsible for providing the child with a normal, wholesome home life, DYFS retained the ability to remove the child without the foster parents' consent at any time; to approve vacation and visiting schedules; to approve important medical decisions; to provide the child with a clothing allowance; to pay for medical and dental care, and to control the incurring of any expenses for which the foster parents would seek reimbursement. Despite the extensive control retained by DYFS, it does not include the details of the day-to-day supervision of the foster child. This is significant here, because it is the quality of that supervision which is called into question by the underlying negligence claim.

On the other hand, there are many types of work which do not include direct supervision by an employer and nevertheless maintain the status of the worker as an employee. This is particularly true in the public sector. Included are virtually all governmental officeholders such as mayors, councilmen, engineers, attorneys and judges. *See, e.g., Martin v. Rochelle Park Tp., supra; see, also, McQuillin, Municipal Corporations,* §§ 12.27 & 12.208 (1979). The fact that such persons may be considered independent contractors in other settings does not preclude their employee status for purposes of the Tort Claims Act. *N.J.S.A.* 59:1–3; *cf. Woodsum v. Pemberton Tp.,* 172 *N.J.Super.* 489 (Law Div.1980).

The same overlap may occur in the private sector. *Fitzpatrick v. Haberman,* 16 *N.J.Super.* 490 (App.Div.1951) (painting work by superintendent); *DeMonaco v. Renton,* 18 *N.J.* 352 (1955) (sidewalk newsboy); *Marcus v. Eastern Agricultural Ass'n, Inc.,* 58 *N.J.Super.* 584 (App.Div.1959), rev'd 32 *N.J.* 460, 461 (1960) (farmer raising chicks). The *Marcus* case is particularly instructive—not only as an example of how far the courts have been willing to go to find employee status but moreover because, like here, the analysis is made against a backdrop of social legislation. *Marcus* was a workman's compensation case in which the petitioner was a farmer who raised chicks for the defendant corporation. Although petitioner used his own facilities and was independent in many ways, there was found to be sufficient control over particulars to justify a finding that he was an employee. As noted, "the requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be done and the capabilities of the particular person doing it." *Id.* at 597 (dissent by Conford, J. A. D., adopted by Supreme Court). What is critical is that the employer had the right to control, not that he exercised it. *Id.* at 599; *see, also, Tofani v. Lo Biondo Brothers Motor Express, Inc.,* 83 *N.J.Super.* 480, 486 (App.Div.1964).

Despite the above conclusion, Judge Conford ultimately found that the various tests normally used for determining employee status were unsatisfactory in such a setting (control, manner of payment, right to terminate, use of equipment, etc.). *Marcus v. Eastern Agricultural Ass'n, Inc., supra* at 600–603. The more persuasive and relevant guideposts he found to lie in the implementation of the statutory objectives of the workmen's compensation statute. The legislation involved was remedial and part of its impact was to channel the cost of industrial accidents to the consumers through the cost of the product. He then applied a " 'relative nature of the work test'; *i.e.,* whether or not the work is a part of the regular business of the employer...." *Id.* at 603. It was found that, in contradistinction to a truly independent contractor, petitioner there had neither the risk of loss nor the opportunity for profits. *Id.* at 604. Petitioner was thus held to be an employee.

Judge Conford's analysis is most appropriate here. To begin with, the relationship now being reviewed is not even a business in the true sense of the word. The care of foster children is a public service in which there is no profit by any of the participants. Although that fact is not dispositive of the status of the Bells, it does bear on the reasonable expectations of the parties. It also directly impacts on the public-policy aspects of the question. For example, does it serve any legitimate goal, statutory or otherwise, to have the risk of loss for injuries to abandoned children borne by the people who volunteer to care for them? Presumably not. Secondly, to the extent that "control" is a critical factor, the control by DYFS is, in a sense, absolute. Foster parents have no say with respect to the terms under which they accept a child for temporary care. Although an agreement is signed between them and DYFS, it is neither negotiated nor arm's length; rather, it is a set of terms dictated by the State. It is true that many aspects of the care of the child are delegated to the foster parents, but that does not mean that they have bargained for such control. Neither does the fact that the Bells were responsible for the everyday care of the

child necessarily require that they be viewed as independent contractors. As in *Marcus, supra,* the supervision exercised by DYFS was consistent with the type of work being performed and the nature of the "business." Finally, if the "relative nature of the work" test is utilized, then clearly what the Bells did was part of the regular "business" of the State. *Id.* at 604. Under all of the circumstances, therefore, the most appropriate classification for a foster parent is that of employee. Reference to the statutory background further supports that conclusion.

As noted earlier, DYFS was appointed guardian of the minor plaintiff by court order. Pursuant to *N.J.S.A.* 30:4C–22, that guardianship is "full and complete for *all* purposes and shall vest in the Bureau the custody and control of both the person and the property of its ward...." (Emphasis supplied). It is significant that it is DYFS that is given the control, not the foster parents. The foster parents merely act as an arm of the State in the implementation of the guardianship. They may not act independently.

The above legislation is also relevant to the public-policy aspects of this question. Authority for the activities of DYFS with respect to dependent and neglected children is found in *N.J.S.A.* 30:4C–1 et seq. That act is to be construed liberally. *N.J.S.A.* 30:4C–10. As part of the statutorily defined public policy it seeks to prevent and correct dependency and delinquency among children through the preservation and strengthening of family life. In part, that policy is implemented by the placement of neglected children in family settings as opposed to institutions. The scarcity of suitable foster homes to accommodate the many children coming with the responsibility of DYFS is a fact of which this court can take judicial notice. *Evid.R.* 9(2)(d). To add to the burden of foster parents by asking them to bear the risk of loss in the event of an accidental injury to a child would further decrease the number of available homes. The fact that some families may have homeowners' insurance to cover such risks does not eliminate the potential for financial loss as a result of such a claim.

Despite the remedial aspects of the above legislation and the public policy generally favoring the conclusions previously reached, it may nevertheless be argued that the ultimate source of authority in this setting is the New Jersey Tort Claims Act, a statute admittedly designed to restrict rather than broaden governmental liability. *Woodsum v. Pemberton Tp., supra* at 517. On the other hand, the outcome of this motion is not intended to be dispositive of the substantive question of whether the State has any liability here. For example, no attempt has been made to deal with the question of immunity, either governmental or parental. Presumably such questions, if pursued, would be examined as part of the law-division aspects of the case. The issue now being resolved is the relationship between DYFS and the foster parents, and the appropriate status of the Bells. Accordingly, the policy favoring a limitation on governmental liability does not preclude the result reached here.

In summary, it is the conclusion of this court that the Bells may be properly designated as state employees for purposes of the New Jersey Tort Claims Act and *N.J.S.A.*30:4C–1 *et seq.* They are thus entitled to indemnification pursuant to *N.J.S.A.*59:10–1 & 2. Plaintiffs' motion for summary judgment is granted.