MAYBERRY v PRYOR

Docket No. 74387. Argued March 7, 1985 (Calendar No. 14).—Decided
    September 24, 1985.

Kay Mayberry, as conservator of the estate of Justin Mayberry, a
    minor, brought an action in the Saginaw Circuit Court against
    Alfred Pryor and Carol Pryor, foster parents licensed by the
    Department of Social Services, alleging negligent supervision of
    Justin in allowing him to be attacked by a neighborhood dog
    while in residence at their home, and against the owners of the
    dog. The court, Gary R. McDonald, J., granted the Pryors'
    motion for summary judgment on the ground that the Pryors,
    as foster parents, were entitled to the defense of parental
    immunity. The Court of Appeals, DANHOF, C.J., and ALLEN and
    HANSEN, JJ., affirmed, holding that persons who assume tempo-
    rary foster care of a child pursuant to a probate court order
    stand *in loco parentis* to the foster child (Docket No. 63596).
    The plaintiff appeals.

    In a unanimous opinion by Justice CAVANAGH, the Supreme
    Court *held:*

    Foster parents may not invoke the defense of parental immu-
    nity in an action by a foster child for damages arising from
    negligent supervision and may be held liable for negligent
    conduct which proximately causes injury to the foster child.

    1. A child may bring an action against a parent for injuries
    suffered as a result of ordinary negligence of the parent except
    where the alleged negligence involves an exercise of reasonable
    parental authority over the child or reasonable parental discre-
    tion in providing food, clothing, housing, and medical, dental
    and other care. Parental immunity from suit has been extended
    in other jurisdictions to include persons who stand *in loco
    parentis* and who are related to the child by consanguinity,
    marriage, or adoption. Foster parents in Michigan generally
    are not so related, but, rather, provide temporary care for a

REFERENCES FOR POINTS IN HEADNOTES
[1, 3] Am Jur 2d, Parent and Child § 90.
[1-3] Am Jur 2d, Parent and Child § 151 *et seq.*
    Right of parent to regain custody of child after temporary condi-
    tional relinquishment of custody. 35 ALR4th 61.

child in accord with a contractual arrangement with the Department of Social Services as an alternative to institutionalized care in return for compensation by the state. The natural parents continue to be the child's legal guardians and are financially responsible for support. The state is the foster child's legal custodian, assigning only certain responsibilities to the foster parents. Placement of a child in a foster home generally is not voluntary and occurs by order of the probate court. Foster parents knowingly and voluntarily assume a contractual duty to provide supervisory care and should be held responsible for any failure to use reasonable care.

2. The traditional rationales for parental immunity—preservation of the family unit and domestic tranquillity, protection of family resources, and a reluctance to interfere with parenting decisions—do not exist in a foster parent and foster child relationship. The goal of the foster-parent program is not to create a new family unit or to encourage permanent emotional ties between the child and the foster parent, but to provide a stable, nurturing, noninstitutionalized environment for the foster child while the natural parent or caretaker attempts to remedy the problems which precipitated the child's removal or, if parental rights have been terminated, until suitable adoptive parents are found. The licensing and monitoring of foster parents by the department limit the foster parents' parenting decisions and allow the state to suspend a foster parent's license because of negligent supervision. It would be incongruous not to allow the foster child to sue for injuries incurred because of such negligence.

3. Foster parents provide a greatly needed and appreciated service to children who would otherwise have to be institutionalized. The question presented in this case involves a balancing of the foster child's interest in receiving proper care and being compensated for injuries with the foster parents' interest in providing foster care without fear of litigation. On balance, the interests of the child outweigh those of the foster parents, and the parental immunity doctrine should not be further extended.

Reversed.

134 Mich App 826; 352 NW2d 322 (1984) reversed.

1. PARENT AND CHILD — NEGLIGENCE — PARENTAL IMMUNITY — FOSTER PARENTS.

Foster parents cannot invoke the defense of parental immunity in an action by a foster child for damages arising from negligent supervision and may be held liable for negligent conduct which proximately causes injury to the foster child.

2. PARENT AND CHILD — NEGLIGENCE — PARENTAL IMMUNITY.

A child may bring an action against a parent for injuries suffered as a result of ordinary negligence of the parent except where the alleged negligence involves an exercise of reasonable parental authority over the child or reasonable parental discretion in providing food, clothing, housing, and medical, dental and other care.

3. PARENT AND CHILD — NEGLIGENCE — PARENTAL IMMUNITY — FOSTER PARENTS.

Because the traditional rationales for parental immunity—preservation of the family unit and domestic tranquillity, protection of family resources, and a reluctance to interfere with parenting decisions—do not exist in a foster parent and foster child relationship, and because the licensing and monitoring of foster parents limit the foster parents' parenting decisions and allow the state to suspend a foster parent's license because of negligent supervision, the defense of parental immunity is not available to foster parents in an action by a foster child for injuries incurred as a result of negligent supervision.

*Allsopp, Fitzgerald & Kolka* (by *William W. Allsopp*) for the plaintiff.

*Collison, Chasnis & Dogger, P.C.* (by *John A. Chasnis*), for defendants Pryor.

CAVANAGH, J. This appeal presents three questions for our consideration:

1) May foster parents invoke the defense of parental immunity in negligence suits brought by or on behalf of a foster child placed in their care?

2) If so, does negligent supervision of a child fall within the purview of the parental immunity doctrine?

3) If so, is the reasonableness of the alleged parental conduct a question of law or fact?

We hold that foster parents cannot invoke the defense of parental immunity and therefore may be held liable for their negligent conduct which proximately causes injury to their foster child. In

light of this holding, we need not address the remaining two questions.

I

Defendants Alfred and Carol Pryor were properly licensed by the Department of Social Services as foster family home parents. Justin Mayberry was placed in their home in October, 1977, after the Bay County Probate Court temporarily removed him from the custody of his natural mother, plaintiff Kay Mayberry.[1] At the time of the initial placement, Justin was twenty-two months old and deaf. Justin was briefly returned to Ms. Mayberry's custody twice, but was removed to the Pryors' home after appropriate hearings.

On November 18, 1979, Justin, then about four years old, was allegedly attacked by a German shepherd dog while sitting alone on the front porch of the Pryors' home. Because of his deafness and inability to communicate, Justin was unable to cry out for help. As a result of the attack, he suffered serious injuries and permanent brain damage. Justin apparently has been placed in a state residential facility because of his physical and mental disabilities.

Ms. Mayberry filed a complaint in June, 1980, against the Pryors for negligent supervision, and against defendants Ralph and Susan Day, the owners of the dog. The Pryors moved for summary judgment on the ground that their foster parent status entitled them to invoke the defense of parental immunity. In March, 1982, the Saginaw Circuit Court granted the Pryors' motion pursuant

[1] One other sibling was temporarily placed with the Pryors, but was successfully returned to Ms. Mayberry's custody. Two other siblings remained in Ms. Mayberry's custody throughout the probate court proceedings.

to GCR 1963, 117.2(3).[2] The Court of Appeals affirmed. 134 Mich App 826; 352 NW2d 322 (1984), and certified, pursuant to Administrative Order No. 1984-2, that its decision was in conflict with *Grodin v Grodin,* 102 Mich App 396; 301 NW2d 869 (1980), *lv den* 412 Mich 867 (1981). We granted plaintiff's application for leave to appeal. We directed the parties to brief whether *Plumley v Klein,* 388 Mich 1; 199 NW2d 169 (1972), was properly applied to the instant case and whether foster parents may invoke parental immunity. 419 Mich 901 (1984).

## II

In *Plumley,* this Court joined a growing number of jurisdictions which have abolished the common-law rule that children cannot bring a tort cause of action against their parents. We retained the defense of parental immunity in only two limited situations:

> A child may maintain a lawsuit against his parent for injuries suffered as a result of the alleged ordinary negligence of the parent. Like our sister states, however, we note two exceptions to this new rule of law: (1) where the alleged negligent act involves an exercise of reasonable parental authority over the child; and (2) where the alleged negligent act involves an exercise of reasonable parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care. [388 Mich 8.]

Although *Plumley* addressed only the tort liabil-

---

[2] Shortly before summary judgment was granted, Ms. Mayberry voluntarily released her parental rights to Justin because of her inability to care for his special needs. Apparently a guardian ad litem has replaced her as conservator of the child's estate.

The suit against the Days is apparently still pending.

ity of a natural parent, the circuit court and Court of Appeals concluded here that persons acting *in loco parentis* to a child could also invoke the defense of parental immunity. Citing *Hush v Devilbiss,* 77 Mich App 639; 259 NW2d 170 (1977),[3] the circuit court reasoned that licensed foster care homes provide children, whose natural parents are unwilling or unable to provide proper care and supervision, with a healthy and supervised environment. Since by definition foster parents replace the function of natural parents, the circuit court concluded that the Pryors stood *in loco parentis* to Justin. The Court of Appeals similarly held, as a matter of law, that persons who provide temporary foster care to a child pursuant to a probate court order stand *in loco parentis* to the foster child. 134 Mich App 830.

Both lower courts then held that an action for negligent parental supervision is barred because it involves the exercise of parental authority over a child, which falls within the first *Plumley* exception. *Id.,* pp 830-831.[4] Finally, they concluded that

[3] In *Hush,* the Court of Appeals reasoned that the rationales for parental immunity—preservation of domestic tranquillity and family unity, protection of family resources, and avoidance of judicial intervention in parenting decisions—were equally applicable where a person voluntarily assumes parental responsibility and attempts to create a homelike environment for a child. Since *Plumley* did not specifically limit immunity to natural parents, the Court concluded that persons who intend to assume parental status can stand *in loco parentis* to a child and therefore can invoke the defense of parental immunity. 77 Mich App 644-647.

Since we need not reach this issue, we express no opinion as to the validity of the *Hush* Court's reasoning. We note, however, that the tort liability of the child's grandmother was at issue there, rather than the liability of a foster parent. Moreover, the child had been voluntarily placed in the grandparents' care by the natural parents because of the mother's prolonged illness.

[4] The Court of Appeals has consistently held that an action alleging negligent parental supervision falls within the first *Plumley* exception. *Wright v Wright,* 134 Mich App 800, 806-807; 351 NW2d 868 (1984); *McCallister v Sun Valley Pools, Inc,* 100 Mich App 131, 137-139; 298 NW2d 687 (1980), *lv den* 411 Mich 905 (1981); *Hush,* 77 Mich

the reasonableness of the exercise of parental authority is a question of law which can be disposed of by motion for summary judgment. The Court of Appeals at first distinguished, then rejected, the seemingly contrary holding in *Grodin*. *Id.,* pp 832-833.[5]

## III

The tort liability of a foster parent is an issue of first impression in this state. Similar cases from other jurisdictions are conflicting. The vast majority of cases which have discussed the tort liability of persons standing *in loco parentis* to a child generally involved the child's stepparents, adoptive parents, grandparents, or other persons re-

App 643-644; *Paige v Bing Construction Co,* 61 Mich App 480, 485; 233 NW2d 46 (1975), lv den 395 Mich 751 (1975). Some other state courts have similarly barred suits for negligent parental supervision. See, *e.g., Holodook v Spencer,* 36 NY2d 35; 364 NYS2d 859; 324 NE2d 338 (1974); *Cherry v Cherry,* 295 Minn 93; 203 NW2d 352 (1972); *cf. Horn v Horn,* 630 SW2d 70 (Ky, 1982); *Cole v Sears, Roebuck & Co,* 47 Wis 2d 629; 177 NW2d 866 (1970).

[5] In *Grodin,* a child filed suit against his mother for negligently taking tetracycline during pregnancy, which caused the child's teeth to discolor. The *Grodin* Court concluded that although the cause of action fell within the second *Plumley* exception, summary judgment for the mother was improper since a fact question existed as to the reasonableness of her conduct. *Grodin,* 102 Mich App 401.

The Court of Appeals in the instant case first attempted to distinguish *Grodin* because it involved the second *Plumley* exception. However, since both exceptions include the word "reasonable," it concluded that *Grodin* was improperly decided. Proper application of the *Plumley* exceptions supposedly required a determination as to the scope of reasonable parental authority or discretion, rather than the reasonableness of the individual parent's conduct.

A similar conclusion was reached in *Wright,* 134 Mich App 808-809. In his concurring opinion in that case, Judge MAHER, who was on the panel which decided *Grodin,* attempted to reconcile the cases. He explained that if there is no reasonable dispute as to whether the alleged tortious activity falls within one of the *Plumley* exceptions, summary judgment is proper. In *Grodin,* however, there was a dispute as to whether the mother's actions fell within the second exception. Thus, summary judgment was improper. *Wright,* pp 809-810.

Since we need not decide this issue here, we express no opinion as to which interpretation, if either, is proper.

lated by consanguinity, marriage, or adoption. In addition, the child was generally visiting with or being cared for by these persons with the natural parents' consent when the injury occurred. See cases discussed in 6 ALR4th 1066, § 4, pp 1087-1093; 41 ALR3d 904, § 11, pp 960-963.

The situation is markedly different when a foster care arrangement is involved. Foster parents and foster children are not related by consanguinity, marriage, or adoption. See MCL 722.111(f); MSA 25.358(11)(f). They are brought together by means of a preexisting contractual arrangement between the DSS and the foster parents in which the latter are compensated for expenses incurred in caring for the child. See MCL 400.115a-c, 712A.25; MSA 16.490(25a)-(25c), 27.3178(598.25). The foster parents and home must conform to specific statutory and regulatory guidelines and the DSS is required to monitor them. See MCL 722.111 *et seq.;* MSA 25.358(11) *et seq.;* 1979 AC, R 400.191 *et seq.*

In addition, placement of the child in a foster family home generally is not voluntary. It often occurs after the child has been physically removed from the custody of the natural parent or other caretaker by order of the probate court after an adversary hearing due to neglect, mistreatment, or abandonment. See MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.* Even a "voluntary" relinquishment of a child for foster care placement may be induced by threats of court proceedings or the product of uninformed consent. *Smith v Organization of Foster Families,* 431 US 816, 834; 97 S Ct 2094; 53 L Ed 2d 14 (1977).

Finally, the goal of foster care is not to create a new "family" unit or encourage permanent emotional ties between the child and foster parents.

Foster care is designed to provide a stable, nurturing, noninstitutionalized environment for the child while the natural parent or caretaker attempts to remedy the problems which precipitated the child's removal or, if parental rights have been terminated, until suitable adoptive parents are found. *Smith,* 431 US 861-862 (Stewart, J., *concurring*). See also MCL 400.18c(2), 712A.19; MSA 16.418(3)(2), 27.3178(598.19).

There are few cases from other jurisdictions involving suits by foster children against foster parents. We are aware of only two cases in which a foster parent has been determined to stand *in loco parentis* to a foster child. In *Miller v Pelzer,* 159 Minn 375; 199 NW 97 (1924), the child was placed with the foster parents shortly after her birth and lived with them for twenty-five years. When she discovered that she was not their natural child, she filed suit alleging fraud and deceit and sought compensation for farm work she had performed. In dismissing the child's suit, the Minnesota Supreme Court initially noted that the family relation which had existed "for all practical purposes was just as sacred as if plaintiff had been the natural daughter." *Id.,* p 377. The true holding of the case, however, was that the foster parents were under no legal duty to inform the child of her true parentage and therefore plaintiff had failed to state a cause of action. Although *Miller* was cited with approval in *London Guarantee & Accident Co v Smith,* 242 Minn 211, 217, n 13; 64 NW2d 781 (1954), the liability of a stepfather was involved in the latter case.

In *Goller v White,* 20 Wis 2d 402; 122 NW2d 193 (1963), the Wisconsin Supreme Court accepted the trial court's conclusion that the foster father stood *in loco parentis* to the foster child. It then proceeded to abolish the defense of parental immu-

nity, except in two limited situations.[6] Since the child's complaint sufficiently alleged negligent parental supervision, a cause of action which did not fall within either exception, the *Goller* Court concluded that the foster father could be held liable. *Id.,* pp 409-413. The concurring opinion would have allowed the suit on the ground that parental immunity should not be extended to foster parents. *Id.,* p 413.

Several courts have permitted foster children to sue their foster parents without discussing the issue of parental immunity.[7] Some cases are distinguishable because the foster parents allegedly engaged in intentional misconduct. See, *e.g., Blanca v Nassau County,* 103 AD2d 524; 480 NYS2d 747 (1984); *Vonner v Dep't of Public Welfare,* 273 So 2d 252 (La, 1973);[8] *Hanson v Rowe,* 18 Ariz App 131; 500 P2d 916 (1972). Actions alleging intentional torts were one of the first exceptions carved out from the parental immunity doctrine.[9] Other courts, while expressing sympathy for the plight of foster parents, have nevertheless permitted suits

[6] The two *Goller* exceptions were adopted nearly verbatim in *Plumley.* However, Wisconsin courts have consistently held that parental supervision does not fall within either exception.

[7] In most of the following cases, the state or county agency charged with supervising the foster care program was also named as a defendant. Generally, the key issue in these cases was whether the governmental agency could be held directly or vicariously liable for the foster child's injuries, whether the foster parents could invoke the defense of sovereign or governmental immunity, or whether the governmental agency was statutorily or contractually required to indemnify the foster parents. None of these issues are presented here.

[8] In *Vonner,* the foster father was held liable on a breach of contract theory for failing to provide proper board and care, rather than for any actual participation in the beating of the foster child inflicted by the foster mother.

[9] See Prosser, Torts (4th ed), § 122, pp 866-867; Hollister, *Parent-child immunity: A doctrine in search of justification,* 50 Fordham L R 489, 498 (1982); Note, *The child's right to "life, liberty, and the pursuit of happiness": Suits by children against parents for abuse, neglect and abandonment,* 34 Rutgers L R 154, 164-165 (1981), and cases discussed therein.

alleging negligent supervision. *Headrick v Parker,* unpublished opinion of the Tennessee Court of Appeals, decided August 31, 1984 (Docket No. CA 954) (available on LEXIS); *New Jersey Property-Liability Ins Guaranty Ass'n v State,* 184 NJ Super 348, 354-355; 446 A2d 189 (1982), *rev'd on other grounds* 195 NJ Super 4; 477 A2d 826 (1984). See also *Kern v Steele County,* 322 NW2d 187 (Minn, 1982); *cf. Pickett v Washington County,* 31 Or App 1263; 572 P2d 1070 (1977).

The only jurisdiction which has thoroughly addressed the problem and concluded that foster parents are not entitled to parental immunity is New York. We find the reasoning of *Andrews v Otsego County,* 112 Misc 2d 37; 446 NYS2d 169, 172-174 (1982), to be particularly enlightening:

"Foster parents, in the generally accepted meaning of that term, are contract service providers. The very existence of the status of foster parent arises out of a knowingly assumed contractual relationship between the State and the foster parents." *Matter of Mavis M,* 110 Misc 2d 297, 308; 441 NYS2d 950 [1981]. Although a foster parent may develop significant emotional ties with a foster child, the duties owed to the child are grounded in a "knowingly assumed contractual relation with the State." *Smith v Organization of Foster Families,* 431 US 816, 845; 97 S Ct 2094, 2110; 53 L Ed 2d 14 [1977]. . . . [F]oster care placement is a temporary arrangement designed as an alternative to institutionalized care, and the County agency continues to be the legal custodian of the child. *People ex rel Ninesling v Nassau County Dep't of Social Services,* 46 NY2d 382; 413 NYS2d 626; 386 NE2d 235 [1978]. The natural parent continues to be responsible for the child's support during placement. *Rockland County Dep't of Social Services v Brust,* 102 Misc 2d 411; 423 NYS2d 435 [1979]. The foster parent does not assume "all the obligations incident to the paren-

tal relationship" (*Rutkowski v Wasko,* [286 AD 327, 331; 143 NYS2d 1 (1955)]), but only those responsibilities assigned by the agency as required by law. *Smith v Organization of Foster Families, supra,* 431 US at pp 826-828; 97 S Ct at 2100-2101. See [52A, NY] Social Services Law, § 378 [McKinney's]; 18 NYCRR [New York Codes, Rules and Regulations] § 444.6. Indeed, the "temporary parent substitute must keep his proper distance at all costs to himself." *Spence-Chapin Adoption Service v Polk,* 29 NY2d 196, 205; 324 NYS2d 937; 274 NE2d 431 [1971].

\* \* \*

The second theory of liability also applies here. The [foster parents] knowingly and voluntarily assumed a contractual duty to provide supervisory care for which they received compensation. Having undertaken the duty, they may and should be held responsible for any failure to use reasonable care. *Zalak v Carroll,* [15 NY2d 753; 257 NYS2d 177; 205 NE2d 313 (1965)].

Third, the [foster parents'] duty to provide care was created by contract, not "because of the family relationship." *Holodook v Spencer,* [36 NY2d 35, 44; 364 NYS2d 859; 324 NE2d 338 (1974)]. At the time of placement, there was no familial bond between this infant plaintiff and the [foster parents]. His natural mother continued to be the legal guardian and the County his legal custodian. *Smith v Organization of Foster Families, supra,* 431 US at page 827; 97 S Ct at 2100. Although foster parents owe similar responsibilities to the foster child concerning discipline, food, clothing, housing, education and supervision as are owed to their own biological children, the nature of the required care and supervision is distinct. Foster parents must strive to provide a stable environment and at the same time, encourage, rather than discourage, the relationship of the foster child and natural parent and ease the return of the child to the natural parent. See *State ex rel Wallace v Lhotan,* 51 AD2d 252, 259; 380 NYS2d 250 [1976]. This unique responsibility clearly dif-

fers from the supervisory functions of a natural parent. Moreover, the foster parent-child relationship is designed to be temporary, and the foster parent is obliged to surrender the child upon expiration of the term and perhaps sooner upon the institution of removal proceedings. See, in this respect, *Fox v Mission of the Immaculate Virgin,* [202 Misc 478; 119 NYS2d 14 (1952), *aff'd* 280 AD 993; 117 NYS2d 477 (1952)].

Counsel for the [foster parents] also urges that a number of foster parents assume their responsibility with a view towards adoption and that there may be increasing difficulties in finding suitable foster parents in the future. The Court can appreciate these concerns. However, it must be noted that general legislative policy prefers the ultimate return of the child to the natural parent. Soc. Serv. Law, § 384-b(1); *Smith v Organization of Foster Families, supra,* 431 US at pp 846-847; 97 S Ct at 2110-2111. See also, Note, *The Fundamental Right to Family Integrity and Its Role in New York Foster Care Adjudication,* 44 Brooklyn L R 63, 84-96 [1977]. Although foster parents and children may develop emotional ties, the natural parent retains a paramount right to raise the child. . . . Thus, the Court finds that the concerns expressed by counsel do not tip the public policy scale in favor of an immunity from suit (or, more accurately, nonrecognition of a cause of action).

The Court additionally observes that the County is obliged to contact and observe the foster home and determine whether the foster child is receiving adequate supervision. 18 NYCRR § 428.3(e)(2). Seemingly, negligent or inadequate supervision would serve as a basis for termination of foster care services. It would be incongruous to permit negligent supervision to serve as a basis for termination of foster care service and allow the relationship of foster parent-child existing at the time of the event to preclude a cause of action for negligent supervision.

Accord *Miller v Davis,* 49 Misc 2d 764; 268 NYS2d 490 (1966).

These considerations are equally applicable to this state's system of providing foster care. As previously noted, foster parents and children are brought together solely through a contractual arrangement between the DSS and the foster parents. Foster parents are compensated by the state. The natural parents or other caretakers are required to reimburse the state or county for the cost of foster care if and to the extent they are financially capable. MCL 712A.18(2); MSA 27.3178(598.18)(2). Placement of a child in a foster home is generally designed to be temporary[10] and is monitored by the DSS.

We are not persuaded that the traditional rationales for the parental immunity doctrine—preservation of the family unit and domestic tranquillity, protection of family resources,[11] and a reluctance to interfere with parenting decisions—require or justify extending the defense to foster parents. Licensing and monitoring procedures already exist, which to some degree limit the foster parents' parenting decisions. As the *Andrews* court noted, it would be incongruous to suspend a foster parent's license because of negligent supervision, but not allow the foster child to sue for injuries incurred because of that negligence.

We recognize that the vast majority of foster parents execute their duties conscientiously and provide quality care to their foster children. Foster parents provide a greatly needed and appreciated

---

[10] Placement of a foster child can be made with a view to an adoption by the family with whom the child is placed. See MCL 400.115c; MSA 16.490(25c). There is evidence that the Pryors at one time intended to adopt Justin. Regardless of this intent, at the time Justin resided with the Pryors, Ms. Mayberry's parental rights had not been terminated or released.

[11] We note that the DSS may reimburse foster parents for legal costs incurred in successfully defending suits alleging injury or damage which occurred while the foster parent was acting within the scope of authority as a foster parent. MCL 722.161; MSA 25.358(61).

service to children who would otherwise have to be institutionalized. The question presented today involves a balancing of equally compelling interests —the foster child's interest in receiving proper care and being compensated for his injuries versus the foster parents' interest in providing foster care without fear of litigation. The clear judicial trend is to abolish or limit the availability of the parental immunity defense to both parents and other caretakers alike. We are similarly persuaded that the interests of the child outweigh those of the foster parents and that the parental immunity doctrine should not be further extended. We note, however, that parental immunity from tort liability can be statutorily extended to foster parents if the Legislature so desires.

## IV

The decision of the Court of Appeals is reversed. The case is remanded to the Saginaw Circuit Court for further proceedings consistent with this opinion.

WILLIAMS, C.J., and LEVIN, RYAN, BRICKLEY, BOYLE, and RILEY, JJ., concurred with CAVANAGH, J.